F. L. Bateman, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 47772.  Promulgated April 17, 1936.

*John E. Hughes, Esq.*, for the petitioner.
*Harold Allen, Esq.*, and *R. H. Transue, Esq.*, for the respondent.

OPINION.

McMahon: This is a proceeding for the redetermination of deficiencies in income tax as follows:

| | |
|---|---|
| 1918 | $20, 019. 98 |
| 1919 | 14, 911. 70 |
| 1920 | 26, 295. 02 |

It is admitted by the respondent that he erred in the computation of the deficiencies for 1918 and 1919 in crediting as taxes previously assessed and paid the amounts of $4,797.49 and $5,014.70, respectively, whereas there should have been credited the amounts of $15,520.18 and $14,563.38, respectively. Crediting such amounts to the total tax liability of petitioner as computed by respondent, the deficiencies now claimed by respondent for the years 1918 and 1919 are $9,297.29 and $5,363.02, respectively.

This proceeding was consolidated with the proceeding of William L. Taylor, Docket No. 47773, for hearing only.

In the interest of brevity we set forth the issues, make our findings of fact and render our opinion in this proceeding as to each issue separately. The statement, the order, the numbering and grouping are ours.

## I.

It is alleged in the petition that the assessment and/or collection of the deficiencies herein are barred by the statute of limitations. The respondent affirmatively alleged that the petitioner executed waivers of the statute of limitations, unlimited as to time, and that therefore the assessment and collection of such deficiencies are not barred. The petitioner, in reply, admits the signing of such waivers, but denies that such waivers extend the statutory period of limitation.

*Findings of Fact.*—The petitioner is an individual whose address is No. 7 South Dearborn Street, Chicago, Illinois. The petitioner originated the freight forwarding business. This in general consisted of collecting and combining less than carload shipments into carload shipments so as to secure carload rates, which service sub-

stantially reduced the cost of shipping to the less than carload shippers.

For the years in question here and some years prior thereto the petitioner and W. L. Taylor were the principal stockholders and owners of the Trans-Continental Freight Co., hereinafter referred to as the Trans-Continental Co., and the Bekins Household Shipping Co., hereinafter referred to as the Bekins Co., both being corporations. During the years in question the petitioner was president of both corporations. These corporations were engaged in the freight forwarding business. The petitioner and W. L. Taylor built up this business over a period of years beginning about 1900. Prior to the time that they started this business they were in the railroad service. In May 1925 the Trans-Continental Co. sold all of its assets for a million dollars and distributed the same to its stockholders.

The petitioner filed his personal income tax returns upon the following dates:

| | |
|---|---|
| For 1918 | April 24, 1919 |
| 1919 | March 13, 1920 |
| 1920 | March 15, 1921 |

The Commissioner determined deficiencies in income and profits taxes against the Bekins Co. for the years 1918 and 1920 in the amounts of $2,984.32, and $2,808.24, respectively. On October 30, 1925, the Bekins Co. appealed to this Board from such determination covering the year 1918, Docket No. 8618, and on December 18, 1926, appealed to this Board from such determination covering the year 1920, Docket No. 21981. The proceedings were consolidated, hearing had, and the Board, in its report promulgated September 13, 1928, upheld the contentions of the Bekins Co., that it was entitled to personal service classification for the years 1918 and 1920 under section 200 of the Revenue Act of 1918. On January 17, 1929, in accordance with such opinion, decision of no deficiency in tax for the year 1918, and overpayment of $7,437.91 for the year 1920, was entered.

The Commissioner also determined a deficiency in income and profit taxes against the Trans-Continental Co. in the amount of $79,676.41 for the years 1917, 1918, and 1919. On October 30, 1925, the Trans-Continental Co. appealed from such determination to this Board, Docket No. 8617, alleging in substance as to the years 1918 and 1919 that the Commissioner erred in not granting personal service classification and in not exempting it from payment of income and profit taxes for the years 1918 and 1919 as provided in sections 200 and 231, Revenue Act of 1918, and in the alternative that the Commissioner erred in denying it the full benefit of the relief afforded by sections 327 and 328 of the Revenue Act of 1918 by using improper comparatives in determining the excess profits tax

for 1918 and 1919. No hearing was had. Under date of October 31, 1928, the attorney for the Trans-Continental Co. entered into an agreement to stipulate in Docket Nos. 8617 and 21901 over his signature as follows:

Subject to the approval of the Commissioner of Internal Revenue the following adjustments (together with such other adjustments as arise as a proper and necessary incident thereto) are agreed to as a basis for closing the case of the above-named corporation:

1. Determine the profits tax for the year 1917 under the provisions of Section 209 of the Revenue Act of 1917.

2. Classify the corporation as a personal service corporation under the provisions of Section 200 of the Revenue Act of 1918.

All other issues raised in the appeals to the United States Board of Tax Appeals are hereby specifically waived.

It is understood and agreed that for and in consideration of the above adjustments of the corporation's income and excess profits tax returns for the years 1917 to 1920, inclusive, waivers of any and all limitations for assessment and collection of any tax which may be found due against the individual stockholders will be filed upon request.

On March 11, 1929, upon stipulation, signed by one of the attorneys of record in behalf of the Trans-Continental Co. and filed February 28, 1929, a decision of no deficiency in tax for the years 1918 and 1919 was entered by the Board. The Commissioner also determined a deficiency against the Trans-Continental Co. in income and excess profits taxes for 1920 in the amount of $47,060.02. On December 20, 1926, the Trans-Continental Co. appealed to this Board, Docket No. 21901, upon the grounds that the Commissioner erred in holding that the corporation was not entitled to personal service classification, in reducing the amount of invested capital, and in using improper comparatives in computing the taxes under sections 327 and 328 of the Revenue Act of 1918. No hearing was had. On March 11, 1929, upon stipulation signed by one of the attorneys of record on behalf of the Trans-Continental Co., a decision of no deficiency for 1920 was entered by the Board.

The petitioner, with the advice of his counsel, and the respondent duly signed an agreement (Treasury Department form 8723) under date of December 22, 1928, wherein the petitioner agreed to waive the time prescribed by law for making any assessment of the amount of taxes due under any return of the petitioner for the years 1917, 1918, and 1919:

* * * provided that such assessment shall be attributable to the allowance of a personal service classification to the Trans-Continental Freight Company, a corporation organized under the laws of Illinois, from which the undersigned received dividends or other income.

The petitioner and the respondent duly signed an agreement under date of October 15, 1925 (Treasury Department form 8728) waiving

the time prescribed by law for making any assessment of the amount of taxes due under any return of the petitioner for the year 1920:

\* \* \* provided that such assessment shall be attributable to the allowance of a personal service classification to any corporation from which the undersigned received dividends or other income.

The notice of deficiencies for the years 1918, 1919, and 1920 was mailed to the petitioner on January 7, 1930.

*Opinion.*—The petitioner's returns for the years 1918 and 1919 were filed on April 24, 1919, and March 13, 1920, respectively. The five-year period of limitations under the applicable statutes had expired before December 22, 1928, the date of the waiver for 1918 and 1919. Sec. 250 (d), Acts of 1918 and 1921, sec. 277 (a) (2), Act of 1924, and sec. 277 (a) (3), Act of 1926. However, it is well settled, and conceded by petitioner on brief, that ordinarily a waiver executed after the statutory period of limitations has run is valid.[1] Furthermore, this waiver was executed prior to January 1, 1929, and therefore is excepted from the provisions of section 278 (c) of the Revenue Act of 1926, as amended by section 506 of the Revenue Act of 1928,[2] under the provisions of subdivision (f), added to section 278 of the 1926 Act by section 506 of the 1928 Act, which provides that any agreement consenting to the assessment after the expiration of the statutory period therefor, executed after the expiration of such period "shall be valid and effective according to its terms if entered into after the enactment of the Revenue Act of 1928 [May 29, 1928] and before January 1, 1929."[3] The waiver for 1918 and 1919, executed after the enactment of the Revenue Act of 1928 but before January 1, 1929, is therefore not invalid on the ground that it was executed after the five-year period for assessment had expired.[4]

The petitioner contends that the waiver for 1918 and 1919 is invalid as the uncontradicted testimony of the petitioner shows that he signed the waiver under a mistake of law. The petitioner testified that he did not know that the statute of limitations had run when he signed the waiver, and that he would not have signed that waiver if

---

[1] *Helvering* v. *Newport Co.*, 291 U. S. 485; *Stange* v. *United States*, 282 U. S. 270.

[2] SEC. 506. WAIVERS AFTER EXPIRATION OF PERIOD OF LIMITATION.

(a) Section 278 (c) and (d) of the Revenue Act of 1926 are amended to read as follows:

"(c) Where before the expiration of the time prescribed in section 277 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. \* \* \*"

[3] SEC. 506. (b) Section 278 of the Revenue Act of 1926 is further amended by adding at the end thereof a new subdivision to read as follows:

"(f) Any agreement which would be within the provisions of subdivision (c) or (d) of this section but for the fact that it was executed after the expiration of the period of limitation extended by such agreement, shall be valid and effective according to its terms if entered into after the enactment of the Revenue Act of 1928 and before January 1, 1929."

[4] *B. Hayman Co.*, 25 B. T. A. 736. See *Knight-Campbell Music Co.*, 23 B. T. A. 1234; *F. A. Gillespie*, 20 B. T. A. 1068.

he had known.[5] The petitioner also testified that he was represented by counsel at the time and that he signed such waiver with the advice of such counsel.

It is well settled that ordinarily relief can not be obtained on the ground of ignorance of the law or mistake as to what the law prescribes.[6] There is an exception to this general rule;[7] and the petitioner contends that he is within such exception, which is to the effect that relief may be granted where the mistake in law may be treated as analogous to, if not identical with, a mistake of fact.

It is also settled that relief from mistake will not be granted unless the proof thereof is most clear and satisfactory.[8]

The testimony of the petitioner upon this subject is not clear or satisfactory. It does not clearly show whether he did not know of the existence of the statute of limitations, or whether at the time he did not know or have in mind the provisions of such statute and the date of the filing of his return.

The evidence shows and we have found that after the disposition of the Bekins Co. cases an agreement to stipulate the basis for the closing of the Trans-Continental Co. appeals, then still pending before the Board, Docket Nos. 8617 and 21901, was entered into. From such agreement it appears that it was understood that petitioner would sign waivers in consideration of the disposition of the company appeals, as heretofore set forth, as a part of such agreement to stipulate. Subsequent to such agreement to stipulate, the waiver for 1918 and 1919 was signed by the petitioner, with the advice of his counsel, and thereafter the Trans-Continental proceedings were closed by decisions of no deficiencies entered March 11, 1929. While the stipulation above referred to was signed by counsel for the Trans-

---

[5] The petitioner testified as follows:

"A. No, sir, I did not know that the statute of limitations had run in this particular case when I signed the waiver because I thought in those proceedings it was necessary. I had nothing to conceal or nothing to change in the set-up.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. Would you have signed that waiver if you had been informed that the statute of limitations barred the collection of taxes from you for 1918 and 1919?

"A. No, sir, I would not have signed the waiver, because I would then have felt I was passing up some rights which I was not aware of at the time."

[6] 10 R. C. L. 304.

[7] We quote from 10 R. C. L., p. 308, as follows:

"But where a person is ignorant or mistaken with respect to his own antecedent and existing legal rights, interest, or estates, and enters into some transaction, the legal scope and operation of which he correctly apprehends and understands, for the purpose of affecting such assumed rights, interests, or estates, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact."

[8] In *Philippine Sugar, etc., Co.* v. *Philippine Islands,* 247 U. S. 385, 389, it is stated:

"The burden of proof resting upon the appellant can not be satisfied by mere preponderance of the evidence. It is settled that relief by way of reformation will not be granted, unless the proof of mutual mistake be 'of the clearest and most satisfactory character.' [Citing cases.]."

See also 10 R. C. L. 300.

Continental Co., such counsel was also the counsel of the petitioner at that time. The petitioner, during all this time, was an officer and one of the two stockholders of the two corporations, and was active in instituting the appeals before the Board. There is no testimony that the petitioner was not fully advised as to all these matters or that counsel for petitioner, who were also counsel for the Trans-Continental Co. at the time the stipulation was signed in behalf of the Trans-Continental Co., were not authorized to agree to stipulate that the individuals would execute waivers in the event the respondent would change his position; there is no evidence to the effect that petitioner then repudicated such agreement; there is no evidence that such counsel had no knowledge of the provisions of the applicable statutes of limitations and of all the facts, or that they did not know that the period of limitations had expired not only at the time when the petitioner signed the waiver but also at the time the agreement to stipulate was signed. Presumably counsel had knowledge of the law and all the facts. Their knowledge is imputed to and hence is the knowledge of the petitioner.[9] The general rule is that a principal is affected with constructive knowledge, regardless of his actual knowledge, of all material facts of which his agent has notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, although the agent does not, in fact, inform his principal thereof.[10]

The petitioner relies upon *Panther Rubber Mfg. Co.* v. *Commissioner*, 45 Fed. (2d) 314. That case is distinguishable from the instant proceeding on the facts. In that case it appears that the comptroller and the president of the taxpayer corporations at the time the president signed the waivers in question did not know that the statutory period for assessing a tax had expired, and were unaware that the Government had no right to assess an additional tax; that after the signing of such waivers the president consulted counsel for the corporations, whom he was unable to see before the signing of

---

[9] 6 C. J. 638–639, 641.

[10] 2 C. J. 859 ; 2 R. C. L., pp. 962, 963. In *Smith* v. *Ayer*, 101 U. S. 320, involving suits in equity to compel the delivery to the complainants of two promissory notes held by the defendants as collateral security, the court states as follows:

"There is no doubt that Ayer & Co. relied entirely upon the judgment of their attorney as to the power of the executor of the estate of Thomas T. Renick to pledge the note for moneys borrowed to be used in the business of the firm of B. T. Renick & Co. Still they must be held to know the law, and the limitations which it prescribes to the powers of executors in the disposition of property coming into their hands as such officers; and, however free from intentional wrong, they must bear the responsibility of a mistaken judgment with respect to those limitations. The facts brought to the knowledge of their attorney in his inquiries respecting the note and the authority of Benjamin T. Renick to pledge it are considered in law as brought to their knowledge. Information to him of all essential matters affecting the subject he was investigating was in law information to them, and their action must be adjudged accordingly. The law, indeed, goes much further than this: it considers the principal as affected with notice of all facts; notice of which can be charged upon the attorney."

To the same effect, *Rogers* v. *Palmer*, 102 U. S. 263.

**358**

the waivers; that counsel advised him that the statutory period had expired and the waivers, under the circumstances under which they were signed, were not binding; and that the corporations immediately filed a protest with the collector against the assessment of the tax, on the ground that the waivers were of no validity. It there appears also that the president and comptroller did not know the dates of the filing of the corporate returns and that they were misled by the agent, who asserted that unless the waivers were signed the Commissioner would at once proceed to assess the deficiencies. The president and comptroller there had no knowledge, actual or constructive, of the facts or of the rights of that corporation.

Since the knowledge of counsel must, under the law, be imputed to the petitioner, we can not hold, without further proof, that he did not sign the waiver without constructive knowledge of his rights in the premises. Hence the waiver for 1918 and 1919 is valid.

As to the waiver for 1920 under date of October 15, 1925, it is contended that at the time the notice of deficiency was mailed, January 7, 1930, it had expired by lapse of reasonable time. The 1920 return of petitioner was filed March 15, 1921, and the waiver was executed prior to the statutory five-year period of limitation. The determination of petitioner's tax liability depended on the determination of the Bekins Co. case and the Trans-Continental Co. cases. On the determination in those cases depended whether the petitioner was required to include in his taxable income in each year his share of the net income of such companies; whether he was subject to additional assessment or entitled to refunds. The decision in the Bekins Co. case was entered January 17, 1929, and in the Trans-Continental Co. cases, March 11, 1929. Under all the facts and circumstances here present, the delay in mailing the notice of deficiency, about 4¼ years after the expiration of the statutory period for assessment had expired, is not so unreasonable as to invalidate the waiver for 1920.[11]

Furthermore, it has been held that waivers unlimited as to time expire only upon reasonable notice to that effect given by the taxpayer.[12] No notice was given here.

The petitioner contends further that the words in the waiver, "the allowance of a personal service classification", must be taken to

[11] *Big Four Oil & Gas Co.* v. *Heiner,* 57 Fed. (2d) 29; *Greylock Mills* v. *White,* 63 Fed. (2d) 866; certiorari denied, 289 U. S. 760; *Revere Copper & Brass* v. *United States,* 3 Fed. Supp. 157; *Sabin* v. *United States,* 44 Fed. (2d) 70; *Nathan Loeser,* 27 B. T. A. 601.
[12] In *Greylock Mills* v. *Commissioner,* 31 Fed. (2d) 655; certiorari denied, 280 U. S. 566, the Court stated:

"* * * If waivers which are in terms unlimited are to be limited at all, we think they should expire only after the taxpayer gives notice to the Commissioner that he will regard the waiver as at an end after a reasonable time, say three or four months from the date of such notice. In such a rule there is no harshness to either party; on the contrary, it seems to us the most reasonable one. * * *"

mean legal allowance of a personal service classification; that after the appeals to the Board by the Trans-Continental Co. the respondent had no authority to make a valid determination that such corporation was entitled to personal service classification; and that any determination by him that it was, was without jurisdiction, and illegal, and hence not such a determination as is contemplated by the words of the waiver.

After the filing of an appeal with the Board for the redetermination of a deficiency in income taxes the Board has exclusive jurisdiction of the proceeding, subject to review of its decision by a Circuit Court of Appeals or the Court of Appeals of the District of Columbia, and the court's decision is subject to review by the United States Supreme Court upon certiorari. However, controversies between the parties before the Board may be settled in whole or in part without hearing, upon stipulation, waiver, or admission of error by the respondent subject to the approval of the Board.[13] This is what occurred in the Trans-Continental Co. proceedings. There was no determination by respondent following the appeals to the Board in those proceedings; there was a settlement of them, approved by the Board. While it is admitted by the respondent that the Board did not specifically find in the Trans-Continental proceedings that such company was entitled to personal service classification, and did not specifically reverse the respondent's determination that such company was taxable as an ordinary corporation, the record discloses that the Trans-Continental Co. agreed to stipulate, subject to the approval of the Commissioner, to "Classify the corporation as a personal service corporation", and that such agreement to stipulate was, in effect, approved by the Commissioner by entering into the stipulations of no deficiencies for 1918, 1919, and 1920. The Trans-Continental Co., upon the record in those proceedings, was not entitled to a decision of no deficiency unless it was entitled to personal service classification; and the decisions of the Board in those proceedings, Docket Nos. 8617 and 21901, reflect the approval by the Board of the stipulation of the parties that the Trans-Continental Co. was entitled to personal service classification and hence was not subject to income tax.

While the additions to petitioner's income for the year in question are due largely to the disallowance of expense deductions in com-

---

[13] In *Bankers' Reserve Life Co.* v. *United States*, 44 Fed. (2d) 1000; certiorari denied, 283 U. S. 836, the Court stated:

"* * * The signing and filing with the board of a stipulation agreeing to the amount of the deficiency is, in all respects, the equivalent of a hearing, and the entry by the board upon such stipulation of its decision satisfied the requirements of the statute. Moreover, we fail to find in the statute any requirement, when all of the matters in controversy have been agreed to by stipulation, that the board is required to have a trial or a hearing in the case."

See also, *Burrows McNeir*, 30 B. T. A. 418; *Columbian Carbon Co.*, 25 B. T. A. 456.

puting the net income of the Trans-Continental Co., nevertheless any tax upon any income of such company could be lawfully assessed against its stockholders under section 218 (e) of the Revenue Act of 1918 [14] only if the company came within the definition of the term "personal service corporation" set forth in section 200 of the same act.[15] Any assessment made against the petitioner based on his share of the income of such company can only be attributable to the allowance of a personal service classification. The contention of the petitioner that the claims of the respondent for deficiencies in tax are not within the terms of the waiver as "attributable to the allowance of a personal service classification to any corporation from which the undersigned received dividends or other income" can not be sustained.

## II.

It is alleged in the petition that the respondent erred:

(A) In increasing the net income of petitioner by adding thereto alleged income of two corporations as follows:

| Corporation | Year | Amount |
|---|---|---|
| Trans-Continental Freight Co. | 1918 | $19,841.20 |
| Do. | 1919 | 12,647.14 |
| Do. | 1920 | 31,339.30 |
| Bekins Household Shipping Co. | 1920 | 17,139.78 |

(B) In failing to give the petitioner credit for the tax which the Trans-Continental Freight Co. paid on an item designated "Contingent liability of Bush, Beach & Gent" in the amount of $5,500 included in its 1922 income; and

(C) In the alternative, in failing to give the petitioner credit in 1920 for taxes paid by him on one-half of $19,925.29 included in his

---

[14] SEC. 218. (e) Personal service corporations shall not be subject to taxation under this title, but the individual stockholders thereof shall be taxed in the same manner as the members of partnerships. All the provisions of this title relating to partnerships and the members thereof shall so far as practicable apply to personal service corporations and the stockholders thereof: *Provided,* That for the purpose of this subdivision amounts distributed by a personal service corporation during its taxable year shall be accounted for by the distributees; and any portion of the net income remaining undistributed at the close of its taxable year shall be accounted for by the stockholders of such corporation at the close of its taxable year in proportion to their respective shares.

[15] SEC. 200. That when used in this title—

&ast; &ast; &ast; &ast; &ast; &ast;

The term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits or income derived from trading as a principal, or (2) of gains, profits commissions, or other income, derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive;

1921 income as received from the Trans-Continental Freight Co. and for taxes paid by him on one-half of $8,675.41 included in his 1921 income as received from the Bekins Household Shipping Co.

*Findings of Fact.*—(A) The respondent increased the net income of the Trans-Continental Co. for 1918, 1919, and 1920 by adding thereto, $48,051.41, $25,301.89, and $62,828.59, respectively, which additions to income arose from the adjustments made by the respondent as set forth in the margin.[16]  As a result of such adjustments in the net income of the company he increased the taxable income of the petitioner for 1918, 1919, and 1920, respectively, by adding thereto one-half of such net income less the amount previously reported by him as his share of the income of such company as shown in the margin.[17] The schedules in footnotes 16 and 17 are hereby made a part of these findings of fact.

The items designated expenses of the petitioner and W. L. Taylor, respectively, disallowed by the respondent in each year in question

---

[16] See table:

Adjustments for 1918:

| | |
|---|---:|
| Expense of F. L. Bateman, disallowed | $14,077.32 |
| Donations to branch officers disallowed | 593.50 |
| Adjustment of income on account of New York items | 13,842.83 |
| Expense of W. L. Taylor, disallowed | 19,537.76 |
| Total increase in income | 48,051.41 |

Adjustments for 1919:

| | | |
|---|---:|---:|
| Contingent liability of Bush, Beach & Gent disallowed | | 5,500.00 |
| Expense of F. L. Bateman disallowed | | 12,594.41 |
| Expense of W. L. Taylor disallowed | | 15,582.50 |
| Total | | 33,676.91 |
| Less: | | |
| Error in New York Export account receivable, not discovered until after books were closed | $6,983.03 | |
| Additional depreciation allowed on automobiles | 1,391.99 | |
| | | 8,375.02 |
| Total increase in income | | 25,301.89 |

Adjustments for 1920:

| | | |
|---|---:|---:|
| Error in export accounts receivable | | 6,983.03 |
| Adjustment of unreported cars | | 19,925.29 |
| Expense of F. L. Bateman disallowed | | 15,270.17 |
| Expense of W. L. Taylor disallowed | | 22,588.70 |
| Total [error of $37.50 unexplained] | | 64,804.69 |
| Less: | | |
| Additional depreciation on automobiles | | 1,976.10 |
| Total increase in income | | 62,828.59 |

[17] See table:

| | 1918 | 1919 | 1920 |
|---|---:|---:|---:|
| Income from Trans-Continental Co. reported by petitioner | $26,289.19 | $29,931.95 | $35,791.49 |
| Increased by respondent | 19,841.20 | 12,647.14 | 31,339.30 |
| Total | 46,130.39 | 42,579.09 | 67,130.79 |
| Company income as computed by respondent, of which the above totals are one-half | 92,260.78 | 85,158.18 | 134,261.57 |

here in computing the net income of the Trans-Continental Co., represent the aggregate of items entered during each year as expenses in the books of such company as moneys advanced to or to reimburse the petitioner and W. L. Taylor for expenses incurred or paid by them in the conduct of the business of the company for the entertainment of customers, shippers, and traffic agents, including the purchase of theater tickets, baseball tickets, entertainment similar to that extended by other business men to their customers, payment of hotel bills of visiting customers if their business with and interest in the company warranted it, traveling expenses of the petitioner and W. L. Taylor, and payments of $5 or thereabouts and commissions of 20 to 30 cents per hundred pounds to those in charge of traffic for industries and various employees engaged in the handling of shipments and traffic of railroads and steamship lines, such as shipping clerks, car clerks, traffic managers, consignment clerks, team track foremen, dock track foremen, captains, and others, as an inducement to load the shipments of the Trans-Continental Co. and to expedite and facilitate the traffic so as to effect prompt delivery of such shipments. Payments were also made to passenger agents for sending prospective shippers to the company. The petitioner and W. L. Taylor, in conducting the business of the Trans-Continental Co., were chiefly engaged in soliciting business and making contacts with prospective shippers and railroad employees. The amounts designated as expense of the petitioner and W. L. Taylor were disbursed by them in the years shown in the conduct of the company's business and in its behalf, and no part thereof was used for their personal benefit. During the years in question traffic was greatly congested. It was very difficult to obtain cars. Under the method of handling traffic it was vitally necessary to the success of the business to move the traffic. This required contacting all those engaged in or in charge of the movement of traffic, whether connected with industries or railroads and steamship lines, and necessitated the above payments. It was a common practice among petitioner, his associate, and their competitors in those days and aided in the production of the income of the company.

The item of $13,842.83 designated "Adjustment of income on account of New York items", disallowed as an expense deduction and added to the 1918 income of the Trans-Continental Co. by the respondent, consists of several items, including items of $4,033.21 and $2,787.23. The $4,033.21 item represents prepaid expense in connection with Pacific export cars which were in transit. Freight charges on shipments for export were required to be prepaid. If such shipments did not reach their destination, the prepaid freight would be refunded. This item, however, was never refunded. The item of $2,787.23 represents freight actually paid during 1918 on the salvaged

contents of cars which had been wrecked just before the close of the previous year.

(B) Suit was brought in 1919 by Bush, Beach & Gent against the Trans-Continental Co., and in 1922 it was decided in favor of the Trans-Continental Co. In 1919 the Trans-Continental Co. set up on its books a contingent liability of $5,500 owing Bush, Beach & Gent, and in 1922 it included the amount of $5,500 in its gross income and paid tax thereon. In 1919 the respondent disallowed the $5,500 as an expense deduction and restored it to 1919 income.

(C) An item of $19,925.29, designated "Adjustment of unreported cars", added by the respondent to the company's income for 1920, consists of a "recapitulation of cars in transit", which cars were dispatched in 1920 but were not delivered to destination until after the close of 1920. These were domestic shipments and the freight was not prepaid. The cars were weighed and classifications on the basis of which rates were extended were revised at destination. The distribution and unloading charges were determined at destinations. The company was billed by the railroad companies on these shipments after they had reached their destination.

The respondent also increased the petitioner's net income of 1920 by adding thereto $17,139.78 representing one-half of the 1920 net income of the Bekins Co. as computed by the respondent. In computing the 1920 net income of such company, the respondent increased it by the amount of $8,675.41 representing an adjustment for cars unreported on December 31, 1920. The item of $19,925.29 and the item of $8,675.41 are similar in character. The returns on these cars involved in the items of $19,925.29 and $8,675.41 were entered on the books of the two respective companies in 1921 and the petitioner included his share of the net income thereof in his 1921 tax report and paid the taxes thereon. No refund of such taxes has ever been made to him. The revenue agent's audit, made in 1923, did not extend beyond 1920 and these items were not adjusted in 1921.

*Opinion.*—The petitioner contends that the respondent erred in several respects in the recomputation of the income of the Trans-Continental Co. The respondent pleaded and contends that the petitioner is equitably estopped from questioning the validity of the stipulation entered into in the Trans-Continental Co. cases disposing thereof or from repudiating its effect upon his individual income tax liability for any of the years covered by such stipulation. It has been held by the Board that where a cause was heard on its merits and final determination made of the tax liability of a transferor, the transferees, being parties in privity with such transferor, are precluded from contesting the correctness of the tax determined in

the prior cause against such transferor.[18]  However, the Board has also held that where no hearing on the merits was had, a transferee or party in privity who was not a party to the prior proceeding is not precluded from inquiring into the correctness of the amount of the tax assessed against the transferor.[19]  Under such holding of the Board, since there were no contests and no hearings were had in the Trans-Continental Co. proceedings, and since the petitioner was not a party to such proceedings, he is not estopped in this proceeding from questioning the determination by the respondent of the net income of such company for the years in question.

*Isaac Michael Green*, 26 B. T. A. 719, the only case relied upon by the respondent in support of his contention, is not applicable here.  In that case the only issue in the proceeding against the transferor was whether it was entitled to personal service classification, the parties being in accord as to the amount of taxpayer's net income for the years in question.  A hearing was had and the Board approved the respondent's determination and held that the transferor corporation was not entitled to such classification, but was taxable as an ordinary corporation, 8 B. T. A. 393.  The Board's decision was affirmed in *Green's Adv. Agency* v. *Blair*, 31 Fed. (2d) 96, and became final on May 11, 1929.  Thereafter, the transferee filed his appeal with the Board and the Board therein held in substance that, if a decision is rendered upon the merits and becomes final, parties in privity are bound by such decision not only as to every question raised and determined therein, but also as to any defenses not personal to them which might have been raised but were not.  That case clearly is not controlling here, since the transferor was held to be taxable as an ordinary corporation and the tax liability as computed by the Commissioner was approved by the Board.  In the Trans-Continental Co. proceeding, the respondent's computation of the tax liability of that corporation was not even impliedly approved by the Board, since decisions of no deficiencies as to the years herein involved were entered.

(A) As appears from our findings of fact, respondent, in determining the net income of the Trans-Continental Co., disallowed in each year in question certain items designated as expenses of the petitioner and expenses of W. L. Taylor.

---

[18] *Jahncke Service, Inc.*, 20 B. T. A. 837 ; *J. B. Duval*, 2 B. T. A. 1357 ; affd., *Duval* v. *Commissioner*, 57 Fed. (2d) 496 ; *Isaac Michael Green*, 26 B. T. A. 719.

[19] *Wayne Body Corporation*, 22 B. T. A. 401, wherein transferor's motion to withdraw its appeal was granted without hearing on the merits ; *Stanley Co. of America*, 26 B. T. A. 705, wherein prior proceeding was dismissed on motion of transferors and no hearing held on the merits ; *American Equitable Assurance Co. of New York*, 27 B. T. A. 247 ; affd., 68 Fed. (2d) 46, wherein prior proceeding was dismissed by the Board for lack of jurisdiction ; *D. J. Gay*, 31 B. T. A. 580, wherein prior proceeding was dismissed by the Board for lack of jurisdiction ; *Keener Oil & Gas Co.*, 32 B. T. A. 186, wherein prior proceedings against transferor were dismissed upon motion of its counsel.

Section 218 (e) of the Revenue Act of 1918 provides that all provisions of "Title II—Income Tax" relating to partnerships and the members thereof shall so far as practicable apply to personal service corporations and the stockholders thereof. Section 218 (d) of the same act provides that the net income of a partnership shall be computed in the same manner and on the same basis as provided in section 212 defining the net income of an individual, except that the deduction provided in paragraph (11) of subdivision (a) of section 214 pertaining to charitable and similar contributions shall not be allowed. The question, therefore, to be determined is whether these items of expense were in the years in question "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" within the meaning of section 214 (a) (1) of the Revenue Act of 1918.

The testimony of the petitioner that all these items were disbursed by himself and W. L. Taylor in behalf of the Trans-Continental Co. in the conduct of its business, not only as an aid in and means of obtaining and securing business, but to facilitate the operation and performance of the business of the company, and that no part thereof inured to the benefit of the petitioner or W. L. Taylor, personally, is uncontradicted. The petitioner testified that the items were expended for traveling expenses of the petitioner and W. L. Taylor, for entertainment of customers and traffic agents, and payments made to railroad employees for referring business to the company and for aiding in the movement of freight and traffic so as to facilitate the performance of the company's business, and that it was necessary to the proper conduct of its business to make such expenditures, which testimony is also uncontradicted. The petitioner testified that the company during the years in question employed several regular bookkeepers and that an auditor came in periodically to audit the books; that the books of the company were sent to New York shortly after the sale of the assets of the company in 1925, and were stored in a storage space on a pier the company had under lease, and a few years thereafter the pier accidentally burned and the books were destroyed; that the items were entered in such books as expenses, the practice being to enter them in lump sums, instead of itemizing them in detail, sometimes paid to the petitioner and W. L. Taylor in advance of disbursement by them and sometimes to reimburse them for expenditures of this character made by them; that he kept a personal memorandum book in which he kept a record of such items, although it was not always kept in accurate detail, but that he did not know what became of such memoranda and that he had not kept this book because he did not think it necessary to do so. This testimony is also uncontradicted.

366

In a case decided by the Board where a taxpayer drew $200 per week for travel, entertainment of customers and other expenses, all in unspecified amounts, and where he maintained a system of accounting records, but kept no record therein of the items for which such expenditures were made, the Board held that "where it is conclusively shown that an expense has been incurred or paid, which would be deductible if properly recorded, the lack of recordation should not prevent its deductibility."[20] In another case decided by the Board and acquiesced in by the Commissioner, where claimed deductions for "sales, promotions and entertainment expense" were allowed, the taxpayer kept no records, testifying in effect that the amounts were spent.[21] Here, as appears from the undisputed testimony, the expenses in question were entered upon the books of account of the company and the petitioner also kept a personal memorandum book in which he entered the amounts expended by himself. Furthermore, petitioner's undisputed testimony is to the effect that the amounts entered in the books were actually expended by the petitioner and W. L. Taylor in behalf and for the benefit of the company in the conduct of its business, to secure new business and to increase its income. Cases wherein personal or household expense can not be segregated from entertainment expenses for business purposes, or wherein taxpayer relies on book entries alone and such book entries are not substantiated by evidence as to their correctness and of the facts upon which such entries are based, are distinguishable from this proceeding and are not applicable.[22]

The evidence herein, as well as the record in the *Bekins Co.* case,[23] discloses that the petitioner was a man of high standing and reputation in his community.

---

[20] *A. F. Rees,* 21 B. T. A. 698. To the same effect are *Ned Wayburn,* 32 B. T. A. 813; *R. P. Shea,* 24 B. T. A. 798, 803; *Julia Dahl et al., Executors,* 24 B. T. A. 1167; *H. L. Scales,* 10 B. T. A. 1024, 1027; *Cohan* v. *Commissioner,* 39 Fed. (2d) 540. In *R. P. Shea, supra,* the Board stated:

"* * * He kept no records of amounts expended for this purpose, but testified that at the time he rendered his returns he had the facts before him showing that those were the proper amounts. He further testified that he spent all of the amounts which he claimed in his returns. In this situation, where petitioner Shea did not keep records, but testified that he knew that the amounts claimed were spent for the purpose of furthering his business, we are of the opinion that such amounts constitute allowable deductions from his gross income of the respective years. We believe that such a conclusion is required by the decision in *Cohan* v. *Commissioner,* 39 Fed. (2d) 540. See also *A. F. Rees,* 21 B. T. A. 698."

[21] *R. P. Shea, supra.*

[22] *Joseph F. Logel,* 24 B. T. A. 798, 804, heard and decided with *R. P. Shea, supra;* and *Mollohon Manufacturing Co.,* 13 B. T. A. 952.

[23] In *Bekins Household Shipping Co.,* 13 B. T. A. 353, the Board stated in part:

"* * * the record clearly shows that the large volume of business transacted by the petitioner flowed to it by reason of the extended range of acquaintanceship on the part of Bateman and Taylor, the two principal stockholders, carrying throughout that range of acquaintanceship the prestige, good will, and knowledge on the part of the customers of the *integrity,* business ability, and efficiency of service known to exist in these two men. * * *" [Emphasis supplied.]

The testimony of petitioner is undisputed that the congested condition of traffic and transportation, competition, and shortage of cars in the years in question necessitated payments of varying amounts to employees of railroads, and also industries; that it was a common practice; that it was necessary to obtain cars for their shipments and to move traffic; that under the conditions prevailing at that time these expenditures were required in their business; that every dollar so expended was used in the business of the company; that competition developed to a very considerable extent; that the payments to railroad employees and others were of great value to the company, not only in the successful operation of its business but in the production of business, with its resultant revenue.

*N. H. Van Sicklen, Jr.*, 33 B. T. A. 544, and *Reginald Denny*, 33 B. T. A. 738, wherein deductions claimed were disallowed, are not controlling here, since in those cases the evidence pertaining to such items was very meager, vague, and not clear or satisfactory.

There is no evidence that the payments made to traffic agents and railroad employees were unlawful or made for an unlawful purpose. These payments were in the nature of "tips." While tipping may be deplored by some, it is a common practice; although such practice may create discrimination, it is not against public policy, as reflected in statutory law, and is known to produce results sometimes commendable where other methods fail.[24] There is no evidence showing that the practice was corrupt or tended to corrupt or that it was detrimental to the railroads. There is undisputed evidence that it ultimately benefited the railroads by increasing the volume of their shipments of freight. Nor was the identical business of the Trans-Continental Co. of forwarding freight unlawful or against public policy generally; and it benefited all small shippers affected by it to a marked extent.[25]

It has been shown that the expenses in question were necessary; and if, as stated by the United States Supreme Court,[26] "life in all its fullness must supply the answer to the riddle" and the "norms of conduct" should "help to stabilize our judgment" as to what expenses are "ordinary", we must hold that these expenses, including the payments made to railroad employees and others, were ordinary ex-

---

[24] Cf. *Lawrence A. Wagner*, 30 B. T. A. 1099; *National Outdoor Advertising Bureau, Inc.*, 32 B. T. A. 1025.

[25] *Interstate Commerce Commissioner* v. *Del. L. & W. R. R. Co.*, 220 U. S. 235. The Trans-Continental Co. was one of the parties before the Supreme Court in that case, wherein a decision of the Interstate Commerce Commission was sustained and was quoted from (see 14 I. C. C. 433) with approval as follows:

"* * * under this practice has developed an immense volume of traffic which otherwise could never have been brought into being. It is not an exaggeration to say that the enforcement of such a rule [in effect prohibiting the business of the Trans-Continental Co. and others] by the carriers of the United States would bring disaster upon thousands of the smaller industries and more surely establish the dominance of the greater industrial and commercial institutions."

[26] *Welch* v. *Helvering*, 290 U. S. 111.

penses. Since the expenses were ordinary and necessary, they are deductible. In the *Belkins Co.* case, *supra*, expenses of similar nature were not even questioned and were, in fact, allowed as deductions.

The item of $13,842.83 restored to income in 1918 included two items, one of $4,033.21 and one for $2,787.23. The deductibility of these items as an expense depends in part upon the method of accounting employed by the Trans-Continental Co. There is no evidence as to the method of accounting used by such company. There is no evidence from which we can determine whether these expenses prepaid in 1918 are properly deductible from 1918 income or from income of the subsequent year or years. Although paid in 1918, if the books were kept on an accrual basis, such freight may nevertheless represent an expense deductible in the year following payment. The Commissioner determined that such expenses were not deductible in 1918. Since we are unable to determine from the evidence that the respondent erred in this respect, his action disallowing such expenses in 1918 must be approved.

(B) The petitioner concedes that the item of $5,500 accrued on the books of the Trans-Continental Co. in 1919 as a contingent liability was not a proper deduction in that year. However, it is contended by the petitioner that, since the Trans-Continental Co. included this item in its 1922 income, the year the suit against it was decided in its favor, in equity the company is entitled to an offset and an allowance of the tax erroneously paid in 1922 on this item, citing *Bull* v. *United States*, 295 U. S. 247, hereinafter distinguished.

By section 218 (d) of the 1921 Act the effectiveness of the personal service provision was limited to December 31, 1921, and thereafter corporations previously classified as personal service corporations were taxed as ordinary corporations. Hence, in 1922, if any tax were required to be paid on its income, such tax would have been imposed upon the Trans-Continental Co. It is well settled that a corporation and its stockholders are distinct and separate taxpaying entities.[27] The tax paid by one taxpayer can not be credited as an offset to the tax due from and payable by another separate and distinct taxpaying entity. Taxes are deductible as such only by those upon whom they are imposed.[28] Taxes, if any, for 1922 having been imposed upon the corporation, no credit therefor may be allowed to the petitioner in 1919.

(C) The respondent increased the 1920 net income of the Trans-Continental Co. by adding thereto the amount of $19,925.29 designated as "Adjustment on unreported cars." The petitioner testi-

[27] *Burnet* v. *Clark*, 287 U. S. 410; *Dalton* v. *Bowers*, 287 U. S. 404; *Edward Securities Corporation*, 30 B. T. A. 918.

[28] *Falk Corporation*, 23 B. T. A. 883; affd., *Falk Corporation* v. *Commissioner*, 60 Fed. (2d) 204; *Caroline T. Kissel*, 15 B. T. A. 1270.

fied that neither the service fees nor the charges pertaining to these unreported cars could be determined in 1920; that the freight thereon was not prepaid; that the company was billed by the railroad company when the cars were weighed at destination and the amount determined. The evidence pertaining to this item is not clear. Whether the item represents an expense item or an adjusted income item is not disclosed. It is not shown how this item was entered on the books of account. We do not know just what the adjustment consisted of. The burden of proof rests upon the petitioner. From the evidence we are unable to determine that the respondent erred and hence we must approve his determination in this respect.

For the same reason, we are compelled to reach a similar conclusion as to the amount of $8,675.41 added to the 1920 income of the Bokins Co. Furthermore, in *Bekins Household Shipping Co.*, *supra*, the Board found that "The item of $8,675.41 added to 1920 income is an adjustment for cars unreported on December 31, 1920, and should be allocated to west-bound freight shipments", and in the "Comparative income and profit and loss statement, 1917–1920" this item is added to the reported net income of such company to show the 1920 net taxable income thereof.

In the alternative the petitioner contends that he is entitled to a credit for tax paid on his share of these items included on his 1921 return. In *Bull* v. *United States*, *supra*, relied on by petitioner, wherein the United States Supreme Court held that the taxpayer was entitled to a credit on his income tax for an estate tax paid on the same item included in income for income tax purposes, notwithstanding that the statute of limitations barred a claim or action for refund or restitution, the evidence disclosed that the amount included in the estate tax return was the same as that included in the income tax return and also the amount of estate tax paid because of the inclusion of such amount in the value of the estate claimed as an offset or credit. There is no clear evidence to the effect that the amounts of profit on such cars included in the 1921 net income of Trans-Continental Co. and the Bekins Co. were the same as the amounts added to their 1920 income. There is no evidence as to the amount of tax which petitioner paid because of the inclusion of his share of such items in his 1921 income tax return. The year 1921 is not before us, and we can not go outside the record to determine what items were included in 1921 income of either the Trans-Continental Co. or the Bekins Co. and reported by the petitioner and the amount of taxes paid by him allocable to items reported in 1921 but included in 1920 incomes of such companies by respondent in his recomputation of such incomes. From the evidence before us we are unable to determine what credit, if any, the petitioner is entitled

to on his 1920 tax liability for taxes paid on the same item of income reported in his 1921 income tax return.

No evidence having been presented as to the other adjustments made by the respondent in computing the net income of the Trans-Continental Co. as set forth in our findings herein, such other adjustments are approved.

## III.

It is alleged that the portion of section 200 [15] of the Revenue Act of 1918 defining a personal service corporation, and subdivision (e) of section 218 [14] of the same act attempting to impose a tax on the stockholder of such corporation on account of the income thereof, are null and void and contrary to the Fifth Amendment of the Constitution of the United States and wholly unauthorized by the Sixteenth Amendment thereof.

*Findings of Fact.*—Both the Trans-Continental Co. and the Bekins Co., which were owned by the petitioner and W. L. Taylor, maintained that they were entitled to the benefits of the statutes in question, and the petitioner was in accord therewith as he, pursuant to the provisions of such statutes, as a stockholder, included in his 1918, 1919, and 1920 returns his share of the net income, if any, of such companies, and was active in the prosecution of the appeals of such companies before the Board, Docket Nos. 8617, 21901, 8618, and 21981.

*Opinion.*—It is well settled that he who avails himself of the benefits conferred by a statute can not deny its validity.[29] Under the authorities set forth in the margin, therefore, petitioner can not successfully challenge the constitutionality of the statutes here involved.

## IV.

The respondent affirmatively alleges that this proceeding constitutes a frivolous appeal as contemplated in section 911 of the Revenue Act of 1926,[30] and that the petitioner therefore is liable to the penalty of $500 provided for therein. These allegations are denied by the petitioner.

[14], [15] For footnotes, see p. 360.

[29] *Buck* v. *Kuykendall*, 267 U. S. 307; *St. Louis Co.* v. *Prendergast Co.*, 260 U. S. 469; *Hurlay* v. *Commission of Fisheries*, 257 U. S. 223; *Wayne Body Corporation, supra; Henry Cappellini*, 14 B. T. A. 1269.

[30] FRIVOLOUS APPEALS TO BOARD

SEC. 911. Whenever it appears to the Board that proceedings before it have been instituted by the taxpayer merely for delay damages in an amount not in excess of $500 shall be awarded to the United States by the Board in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the collector, and shall be collected as a part of the tax.

*Findings of fact.*—This appeal is not frivolous and this proceeding was not instituted by the petitioner merely for delay.

*Opinion.*—The contention of the respondent that the filing and prosecution of this proceeding by the petitioner was so unjustifiable as to constitute a frivolous appeal as contemplated under section 911 of the Revenue Act of 1926 is without merit and without support in the record. The respondent's confession of error which reduced the deficiency for 1918 from $20,019.98 to $9,297.29 and for 1919 from $14,911.70 to $5,363.02 is some justification for such appeal. Furthermore, we have herein sustained the petitioner's contention that the respondent erred in disallowing, as deductions, substantial amounts of expenses for 1918, 1919, and 1920, which is further justification for such appeal. Respondent's request for the imposition of the penalty of $500 provided in such section to be imposed whenever it appears to the Board that proceedings before it have been instituted by the taxpayer merely for delay, or frivolously, is therefore denied.

*Decision will be entered under Rule 50.*