Marra Bros., Inc. v. Commissioner.
Marra Bros. v. Commissioner
Docket No. 2873.
United States Tax Court
1944 Tax Ct. Memo LEXIS 7; 3 T.C.M. (CCH) 1317; T.C.M. (RIA) 44404; December 18, 1944
*7 (1) Petitioner's business for many years has consisted of stevedoring and renting piers for short periods to steamship companies. For the five years, 1936 to 1940, inclusive, its average gross receipts from its business were in excess of $900,000 annually. In 1940 it paid its president, who devoted all of his time to the business and was its chief executive officer, $25,000 for his services. This was the same salary which it had paid him for each of the four preceding years. In the same year it paid its vice-president, who devoted his entire time to the business and was next in responsibility to the president, $20,000 for his services. This was the same salary which it had paid him for each of the two prior years. Held, such salaries were reasonable despite a temporary falling off in petitioner's business during the latter half of 1940 and the Commissioner's action in disallowing as a deduction $10,000 each of the two salaries paid in computing petitioner's net income is reversed. (2) Respondent's action in disallowing $1,500 of the $3,917.66 business expenses claimed as deductions on its return is reversed upon petitioner's proof at the hearing that it expended the amounts *8 claimed on its return and for purposes which caused the amounts to be deductible under section 23 (a), Internal Revenue Code. Carolyn E. Agger, Esq., for the petitioner. Scott A. Dahlquist, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioner's income tax for the year 1940 of $6,544.38. The deficiency is due to two adjustments made in the income tax return filed by petitioner. These adjustments were: Unallowable deductions and addi-
tional income: (a) Officers' compensation
$20,000.00
(b) Traveling and entertaining
expenses
1,500.00
The foregoing adjustments were explained in the deficiency notice as follows: (a) Reasonable compensation for officers under the provisions of section 23 (a) of the Internal Revenue Code has been determined as follows: Charies Marra
$15,000.00
Anthony Marra
10,000.00
Total
$25,000.00
The amount deducted in excess of $25,000.00, or $20,000.00, has, therefore, been disallowed as a deduction from gross income. (b) A deduction of $2,417.66 has been allowed under the provisions of section 23 (a) of the Internal Revenue Code for traveling and entertaining *9 expenses. The amount deducted in excess of that amount, not having been substantiated as business expenses, has been disallowed. Petitioner by appropriate assignments of error contests the correctness of the foregoing adjustments. Findings of Fact Petitioner is a corporation organized and existing under the laws of the State of New York with its principal office in the City of New York. Its income and excess profits tax return for the year 1940 was filed with the Collector of Internal Revenue for the Second Collection District, New York City. Petitioner was founded by Charles Marra, the president of the company in 1924. Its business consists of stevedoring and renting piers for short periods to steamship companies. Petitioner's stevedoring business is carried on principally in Hoboken, Brooklyn, New York, Philadelphia and Jersey City. The total outstanding stock of the company is held by the following persons in the following amounts: Charles Marra
29 shares
Anthony Marra (son of Charles)
1 share Catherine Marra (wife of Charles)
20 shares
The officers of the company are as follows: President
Charles Marra
Vice President
Anthony Marra
Secretary-Treasurer
Catherine Marra
*10 Catherine Marra receives no salary. Charles Marra has been in the stevedoring business for approximately 40 years, having started working in the industry when he was 16 years old. During 1940 he devoted full time to the company's business, working on Sundays when that was necessary. Among other responsibilities assumed by him, Charles Marra daily visited some of the piers where ships were being loaded and unloaded to see that operations were proceeding satisfactorily; conferred with person who had business to be handled; supervised and directed the loading, unloading, and the storing of cargo, which involved consultation with superintendents, foremen and timekeepers in order to insure that the work went forward smoothly and that cargo was properly treated; took care of claims of damage; attempted to obtain new business through social and business contacts with those who employ stevedoring companies; and handled the leasing of piers and their releasing for short periods of time to unloading or loading ships. Charles Marra was the chief executive of the corporation upon whom ultimate responsibility rested for the operation of the business. During the second half of 1940, because of *11 the war, the company lost one of its large customers, the Italian Line. This loss resulted in a decrease in the ordinary stevedoring business but necessitated increased efforts to obtain new business to take the place of the Italian Line. In addition to soliciting new business directly from shipping companies, attempts were made to increase the company's business by the submission of bids upon stevedoring contracts which were awarded in that manner. After the loss of the Italian Line business the company submitted many bids on jobs, some of which were not of the type in which the company would have been normally interested. Charles Marra expected in 1940 that business would improve in the future and that the company would ultimately, although not all at once, replace the loss of the Italian Line business. This expectation has been justified. Charles Marra received a salary of $25,000 in 1940. He received the same salary in 1936, 1937, 1938 and 1939. No question was raised by the Commissioner concerning the reasonableness of this salary prior to 1940. The salary received by Charles Marra in 1940 was in line with the salaries paid by similar companies and was reasonable compensation *12 for services which he actually rendered to petitioner. The company's sales, gross income, net income and dividends paid during the years 1936 through 1940 were as follows: 1936
1937
1938
1939
1940
Sales
$1,010,401.34
$1,125,122.55
$802,085.88
$1,015,911.72
$772,976.24
Gross Income
146,705.77
193,935.36
149,752.30
134,652.77
121,741.37
Net Income
31,739.96
64,586.19
19,723.55
7,310.31
17,711.94
Dividends Paid
25,000.00
35,000.00
None
None
None
Anthony Marra entered the employ of Marra Bros., Inc., at the age of 17 or 18 in about the year 1927. He started work upon the piers as a timekeeper and, as time went on, worked in every aspect of the business; at the receiving office, the delivery office, and with the foremen and the superintendents. He occasionally took charge of gangs which were loading and unloading. He became familiar with all the operations on the pier, including the clerical work performed at the pier, the keeping of the necessary records of delivery from the ship to trucks, to or from lighters or owners. Starting from the bottom and working in all branches of the business he became thoroughly acquainted with all the aspects of *13 the stevedoring business. In 1928 he was made assistant treasurer of the company. He was given this title in order that he might sign checks, particularly in his father's absence in Philadelphia. By 1932 when he became vice-president of the company, Anthony Marra was undertaking general supervisory responsibility at the piers as well as assuming a certain amount of executive responsibility in the office. During 1940, as in earlier years, he daily visited those piers not visited by his father to oversee the work; he handled claims and correspondence concerning the work, took care of insurance problems, and assisted in the preparation of bids. Anthony spent most of his time at the piers and, in the division of labor between himself and his father, took more responsibility than his father for "outside" work because he was younger and could get around more readily to the many places where supervision was necessary. The chief responsibility for obtaining new business was assumed by Charles Marra although Anthony assumed some responsibility in this matter. During the year 1940, Anthony Marra put in full time at his work as in other years, very often including Sundays, holidays or nights. *14 Although there was a considerable falling off in business during the last six months of 1940 on account of the loss of the business of the Italian Line, additional problems had to be met during the last half of 1940. Large amounts of cargo had been left on piers leased by the company to the Italian Line. This cargo had to be disposed of and its disposition was complicated by the fact that it was owned by foreign interests and the alien property custodian was interested in its disposition. Anthony received a salary of $20,000 in 1940; $20,000 in 1939; $20,000 in 1938; approximately $6,800 in 1937; and $6,500 in 1936. No question was raised concerning the reasonableness of the salary paid to him prior to the year 1940. The salary paid Anthony Marra in 1940 was in line with those paid by other stevedoring companies for similar work and was reasonable compensation for the services which he actually rendered to petitioner. In its income tax return for the year 1940, the petitioner deducted $3,917.66 for business expenses. The Commissioner disallowed $1,500 of this sum but did not allocate this $1,500 to any specific items going to make up the $3,917.66. The sum of $3,917.66 [1] was made *15 up of the following items: Downtown Athletic Club
(Dues and restaurant bills)
$ 344.44
Tips to ships' officers
1,895.00
Flowers
31.62
Total
$2,271.06
Travelling expenses to Philadelphia
(Fares and Cabs)
$ 259.50
Tunnel fares
262.00
Parking car
106.00
Telephone and entertainment
1,026.00
Stationery
1.10
Total
$1,654.60
The expenses incurred at the Downtown Athletic Club (dues and restaurant bills amounting to $344.44) were incurred in order to provide for the entertainment of shipping executives and others from whom business might be obtained or with whom business was transacted over the luncheon table. Such club membership and entertainment is customary in the stevedoring business. Both Charles and Anthony Marra used the Downtown Athletic Club for such entertainment, but it was never used to entertain personal friends or relatives. During 1940, the company expended $1,895 in tips to ships' officers. The giving of such gratuities to ships' officers is a long standing custom of the *16 business and the officers expect to receive gratuities. If such gratuities were not given, the ships' officers would not be cooperative. They would report small items of damage which, if they wished, they could fix themselves and the reporting of this damage would be troublesome [2] to the stevedore; and the officers would not cause the ship's crew to have the booms in place ready for work when the ship docked which would delay the work of the men employed by the stevedoring company to unload. [3] If the ships' officers are kindly disposed toward the stevedoring company they can and do assist in the latter's operation in various additional ways such as giving more steam, keeping the lines in order, repairing winches promptly, and other general assistance. During 1940 the company expended $31.62 upon flowers. The expenditure was for flowers sent at the time of the death of relatives of business acquaintances *17 and flowers sent at Christmas to customers. During 1940 Anthony Marra incurred on behalf of the company expenses of $1,654.60 for travel, entertainment and other items. Traveling expenses to and from Philadelphia amounted to $259.50. The company did some loading and unloading at Philadelphia piers. It was frequently necessary that Anthony Marra go to Philadelphia to supervise work there. On no occasion in 1940 did he travel to Philadelphia upon his own personal affairs. The company also loaded and unloaded ships in Hoboken, Brooklyn, New York, Staten Island and Jersey City. In order to make all the necessary inspections in one day at the various points at which work was in progress, Anthony Marra was required to use his car. If he had relied upon public transportation he could not have reached all the points where his supervision was required in the time available. In connection with this use of the car, it was necessary to pay tunnel fares ( $262) to get across the rivers, and to pay for parking ( $106) the car near the New York office and the various piers. Occasionally Anthony Marra used taxicabs to get to piers. Anthony Marra never claimed as expenses from the company tunnel *18 fares or parking fees incurred while on personal business or pleasure. During 1940, Anthony Marra expended on behalf of the company $1,026 for telephones and entertainment. The telephone calls were made to keep in touch with the company's New York office and to customers. Anthony never claimed upon his expense account the cost of any personal telephone calls. Expenses for entertainment, luncheon and occasional theatre parties were incurred in connection with business conferences at lunch with employees and executives of various shipping companies and attempts to obtain the good will of such employees and executives with whose companies the company was doing or hoped to do business. Such entertainment is customary in the business and is expected by the employees and officers of the shipping companies. Anthony Marra did not claim upon his expense account expenses incurred for the entertainment of personal friends or relatives. Opinion BLACK, Judge: The first issue we have to decide is whether the Commissioner erred in disallowing $20,000 of the $45,000 claimed by petitioner as a deduction for salaries paid by petitioner to its president and vice-president during the taxable year. *19 There is no dispute but that petitioner actually paid these salaries during the taxable year. The only issue is as to their reasonableness. It, of course, requires no citation of authorities to establish the principle that the Commissioner's determination is presumed to be correct and that the burden is on petitioner to show that it was wrong. We think petitioner has met that burden of proof. The president of petitioner, Charles Marra, was the one who founded the business. He devoted all his time and talents to it. It was largely due to his efforts that the business had succeeded. His son, Anthony Marra, has grown up in the business, so to speak. After reaching business maturity he was elected vice-president of petitioner and devotes all of his time to the business. The nature of his services have been fully described in our findings of fact and need not be repeated here. It is sufficient to say that he appears to be capable and efficient in the carrying out of his duties as the executive officer of petitioner next in responsibility to the president. The salaries which petitioner paid its president and vice-president in the taxable year were respectively $25,000 and $20,000. The *20 same salary of $25,000 had been paid its president, Charles Marra, by petitioner in the years 1936, 1937, 1938 and 1939. The same salary of $20,000 had been paid by petitioner to its vice-president, Anthony Marra, in the years 1938 and 1939. Deductions for these salaries had been allowed by the Commissioner for these prior years. It is true, of course, that the action of the Commissioner in allowing the deduction of these same salaries in prior years does not estop him from taking a different position in the taxable year. The facts might well be different so as to entirely justify the Commissioner's change of position. We think, however, in the instant case that petitioner has shown by competent evidence that the Commissioner's disallowance of $10,000 in each instance of the salaries paid to petitioner's president and vice-president was without adequate justification. The only reason given by the Commissioner in justification for his action is that the business of petitioner had a considerable falling off in the last six months of 1940 over what it was for the first six months of that year. The evidence does show that there was a very substantial decline in the volume of petitioner's *21 business during this period. This was due to the entrance of Italy in the war during the middle of the year and the consequent withdrawal of the Italian Line from shipping and petitioner's loss of that business. If this decrease in business had been permanent the Commissioner might well be justified in lowering the allowance to petitioner of salary deductions paid to its two executive officers responsible for its operations. The evidence shows, however, that this reduction in volume of business was only temporary. Petitioner's two officers, Charles and Anthony Marra, immediately set to work to find new business and while they were unable to immediately secure enough new business to make up for the loss in business which resulted from the withdrawal of the Italian Line, the testimony was to the effect that the loss was eventually overcome. We think that a mere temporary falling off in business does not justify the Commissioner in disallowing part of the salaries of the men who are chiefly responsible for petitioner's business if the salaries hitherto paid them were reasonable. On this point cf. Heywood Boot & Shoe Co. v. Commissioner, 76 F.2d 586. *22 Petitioner's average volume of business for the five years 1936 to 1940, inclusive, was in excess of $900,000 annually. For a business of this size, $25,000 salary to the president and $20,000 salary to the vice-president, who both devoted all of their time to the business, do not seem excessive. Daniel J. Keogh, secretary-treasurer of the Pittston Stevedoring Corporation, a competitor of petitioner, testified at the hearing. He stated that the annual business of his corporation was around $500,000 and that he received a salary of $16,000 a year as secretary-treasurer and the president of Pittston Stevedoring Corporation, who was its chief executive officer, received $20,000 a year. He also testified that he was familiar with salaries generally paid in the industry and that he considered the salary of $25,000 paid to Charles Marra as president of petitioner and the salary of $20,000 paid to Anthony Marra, as vice-president, were reasonable, taking into account the volume of business which petitioner transacted and the services which these two officials rendered to petitioner. Giving due account to all the evidence, we sustain petitioner's assignment of error as to the Commissioner's *23 disallowance of $20,000 of the salaries which it paid in 1940. The second issue involved in the case requires but little discussion. In petitioner's income tax return for 1940 it deducted $3,917.66 for traveling and entertaining expenses. Of this amount the Commissioner disallowed $1,500 on the ground that amount of the total claimed had not been substantiated. At the hearing petitioner made detailed proof of the items which aggregated the $3,917.66 which it took as a deduction on its return. In fact the separate items proved at the hearing aggregate slightly more than that claimed on the return but petitioner makes no point of that and does not ask for any deduction greater than that which it claimed on its return. The Commissioner in his brief concedes that all the items proved by petitioner are deductible except $1,895 paid as tips to ships' officers. The Commissioner makes no contention that petitioner has failed to prove in any respect that it actually made expenditures aggregating $1,895 as tips to ships' officers. But respondent does contend that such items are not deductible under the applicable law and regulations. On this point respondent says in his brief, among other *24 things: * * * It is urged that these tips or gifts are really gifts in the statutory sense, and are therefore not deductible as an ordinary and necessary expense under the provisions of Section 23 (a) of the Internal Revenue Code. * * * In this contention we do not think the Commissioner can be sustained. It may well be that such tips as are included in the disputed item are not desirable trade practices but we are not aware of any ground of public policy which would exclude them as deductions. We have not been cited to any case which has so held. In our findings of fact we have given the circumstances under which these payments were made and some of the purposes which they were expected to accomplish. We think the evidence brings these payments within the classification of the tips in F. L. Bateman, 34 B.T.A. 351 and which were allowed as deductions in that case. In allowing such tips as deductions, among other things, we said: There is no evidence that the payments made to traffic agents and railroad employees were unlawful or made for an unlawful purpose. These payments were in the nature of "tips". While tipping may be deplored by some, it is *25 a common practice; although such practice may create discrimination, it is not against public policy, as reflected in statutory law, and is known to produce results sometimes commendable where other methods fail. * * * On the authority of F. L. Bateman, supra, the Commissioner's contention as to these tips paid to ships' officers is not sustained. Respondent's action in disallowing $1,500 of the $3,917.66 deductions claimed on its return for business expenses is reversed. Decision will be entered for the petitioner. Footnotes
1. It will be observed that the total of the figures shown above is somewhat larger than the total $3,917.66 deducted by the petitioner. No point is made of the slight disparity.↩
2. The company's insurance for damage to property covers only injuries amounting to more than $5,000. It would not cover small claims. ↩
3. The preparation of the booms is in the nature of a favor or of services rendered because the stevedore is required to do this in his contract.↩