THOMAS K. MCMANUS AND MARGARET F. MCMANUS, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2879-73—2881-73, 8593-73—8595-73.    Filed October 30, 1975.

---

[1] Cases of the following petitioners are consolidated herewith: Estate of John C. Gutleben, Deceased, United California Bank, Executor, and Vera B. Gutleben, Surviving Wife, docket Nos. 2880-73 and 8594-73; Estate of Eleanor B. Chick, Deceased, and Estate of Nelson H. Chick, Deceased, Nelse Chick Siler, Executrix, docket No. 2881-73; Thomas K. McManus and Margaret F. McManus, docket No. 8593-73; Estate of Nelson H. Chick, Deceased, Nelse Chick Siler, Executrix, and Dorothy W. Chick, docket No. 8595-73.

Paul E. Anderson and C. Henry Veit, for the petitioners.
Nicholas G. Stucky and Lamont R. Olson, for the respondent.

OPINION

The case at bar requires us to consider procedural and substantive matters involving the years in issue before this Court. In order to dispose orderly of these issues we believe that the procedural issue should be discussed and determined at the outset.

Petitioners in amendments to their petitions filed in docket Nos. 2879-73, 2880-73, and 2881-73 assert that the deficiency notices issued by the respondent with respect to 1968 are

erroneous because that year is barred by the statute of limitations. The facts with respect to this issue are mainly uncontested.

The petitioners all timely filed their respective individual tax returns for 1968 and hence the standard 3-year statute of limitation would have expired on April 15, 1972, absent the prior execution of valid extensions. Sec. 6501(a), (b), and (c). Attached to these tax returns, as introduced into evidence, are Forms 872-A, the relevant portion of which has been set out in our findings of fact. This form purports to extend the statute of limitations until 90 days after either party appropriately notifies the other that they wish to terminate the agreement. These agreements were executed in docket Nos. 2879-73, 2880-73, and 2881-73 on December 30, 1971, December 31, 1971, and February 23, 1972, respectively. The respondent's notices of deficiency for these docket numbers are dated March 23, 1973.

Petitioners attack the validity of the open-ended nature of these agreements arguing that the use of the term "period" in section 6501(c)(4) [6] requires that the term for which the statute of limitations is extended must be fixed and may not be indefinite. Petitioners do not cite any authority for this proposition, but rely mainly on dictionary definitions of the word "period."

Upon examination of the statute we see no requirement that the statute of limitations can only be extended for a definite period of time. The statute, in fact, does allow for additional extensions of the statute of limitations beyond the period of the original agreement.[7] As noted previously Form 872-A does permit the taxpayer to terminate the agreement upon proper notification to the respondent.

---

[6] SEC. 6501(c)(4). EXTENSION BY AGREEMENT.—Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary or his delegate and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

[7] In Rev. Proc. 71-11, 1971-1 C.B. 679, the respondent explained that the agreement as used in this case was adopted—

"to relieve taxpayers and the Service from the irritations and difficulties of obtaining renewal consents, to relieve the Service, in part, of the problems of maintaining controls to ensure that the period of limitation does not expire during consideration of a case, and to provide a means of restricting the period of limitation to the minimum time required for Appellate Division consideration, * * *"

An agreement of the type in issue may very well not toll the statute of limitations indefinitely. This Court has held in several early cases that "an unlimited waiver extends the statutory period for a reasonable time, or until termination by either party upon reasonable notice." *Ethel D. Co.*, 27 B.T.A. 25, 27-28 (1932), affd. 70 F. 2d 761 (D.C. Cir. 1934). See also *William S. Doig, Inc.*, 13 B.T.A. 256, 260 (1928); *F. L. Bateman*, 34 B.T.A. 351, 358 (1936). In *Greylock Mills v. Commissioner*, 31 F. 2d 655, 658 (2d Cir. 1929), affg. 9 B.T.A. 1281 (1928), cert. denied 280 U.S. 566 (1929), the court said:

> But there is also another ground equally fatal to appellant's contention. If waivers which are in terms unlimited are to be limited at all, we think they should expire only after the taxpayer gives notice to the Commissioner that he will regard the waiver as at an end after a reasonable time, say three or four months, from the date of such notice. In such a rule there is no harshness to either party; on the contrary, it seems to us the most reasonable one. * * *

In this case the agreements were executed between December 1971 and February 1972, the normal statute of limitations expired in April 1972, and the deficiency notices which involved items common to 1968 and 1969 were issued in March 1973. There is no indication in the record that the petitioners ever notified the respondent of a desire to terminate the agreement or complained of unreasonable delay. We believe that the agreements have clearly been reasonably used in the case at issue and should be upheld. Consequently we believe that we should move on to a consideration of the substantive issues as they affect 1968 and the other years in issue.

The remaining issues common to the petitioners relate to their activities with respect to tract 2347. We must decide whether the taxpayers conducted these activities as individuals or as a partnership and whether the gain realized from the sale of portions of tract 2347, including a condemnation sale, by the taxpayers either as individuals or as a partnership should be characterized as ordinary income or capital gain.

As provided by section 761(a) "the term 'partnership' includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on." The regulations expand and explain this definition and include other groups not commonly called partnerships.[8]

---

[8] Sec. 1.761-1(a), Income Tax Regs.:

* * * A joint undertaking merely to share expenses is not a partnership. For example, if two or more persons jointly construct a ditch merely to drain surface water from their

As noted by the regulations mere coownership of property does not cause the creation of a partnership. However, coowners may be partners if the determination is made that they intended actively to carry on the business or venture as a partnership. *Mihran Demirjian,* 54 T.C. 1691 (1970), affd. 457 F. 2d 1 (3d Cir. 1972); *George Rothenberg,* 48 T.C. 369 (1967). The burden of proof is upon the petitioners. *George Rothenberg, supra.* In the present case we believe the evidence shows that the taxpayers did intend to carry on actively their business affairs as a partnership, that they so held themselves out, and that the latter part of section 1.761-1(a), Income Tax Regs., applies to the situation at hand.

The entity known as McManus, Gutleben, and Chick was organized by the taxpayers in 1954. After purchasing a tract of land, plans were submitted to the planning commission to subdivide certain property on two separate occasions. One set of plans was accompanied by a cover letter signed by petitioner as partner on behalf of the taxpayers. Improvements were made to the tract and the individual plots were sold by 1960.

After completing their activity with respect to this tract, the taxpayers then acquired tract 2347. Subdivision plans were again submitted on their behalf and improvements were made to the property. The taxpayers were involved in numerous business negotiations with respect to the property. Some of these negotiations resulted in rental and sale agreements. These negotiations were handled primarily by either petitioner or Gutleben, each with at least the apparent authority to make a commitment for the others.

From 1961 through 1970 partnership tax returns were filed in the name of McManus, Gutleben, and Chick. These returns reflect the various sources of income and expenses and the equal division of the net gain or loss. The accountant who prepared these returns testified that it was always the taxpayers' intention

properties, they are not partners. Mere coownership of property which is maintained, kept in repair, and rented or leased does not constitute a partnership. For example, if an individual owner, or tenants in common, of farm property lease it to a farmer for a cash rental or a share of the crops, they do not necessarily create a partnership thereby. Tenants in common, however, may be partners if they actively carry on a trade, business, financial operation, or venture and divide the profits thereof. For example, a partnership exists if coowners of an apartment building lease space and in addition provide services to the occupants either directly or through an agent. * * *

to share equally in this venture. Books and records were also kept in the partnership name and the capital account reflects entries for partners' drawing in equal amounts.

In July 1967 the taxpayers opened a checking account with each individual signing the signature card as a partner in McManus, Chick & Gutleben, et al.[9] The signature card authorizes the bank to conduct business with any of these individuals. Petitioner, on two separate occasions in correspondence with the respondent protesting changes to his individual income tax return, stated that he was a member of a partnership known as McManus, Gutleben & Chick and that tract 2347 was its asset.

Petitioners argue that the taxpayers never intended to enter into a partnership, that there is no existing written or oral partnership agreement, and that the partnership tax returns were filed merely as a matter of convenience. The support for their first contention rests mainly on the testimony of petitioner, the sole surviving member of the group. While we have no reason to doubt his statements, we believe the substantive evidence, as discussed above, provides us with a better standard with which to judge the relationship of the taxpayers.

It does appear that there is no existing written partnership agreement. However, we have found that the taxpayers have been engaged in this and other activities over a substantial period of time. We have also found that large amounts of money and a substantial degree of personal effort were needed to further this activity. We can only believe that over the years the taxpayers discussed their rights and obligations among themselves and came to some understandings.

Petitioners maintain that the partnership returns were filed only as a matter of convenience and that they do not truly reflect their actual relationship. However, we have found that on several occasions the taxpayers have held themselves out as partners to third parties, and have acted individually on behalf of the others. We have also found the taxpayers have conducted substantial activities with respect to tract 2347.

Petitioners argue that our earlier decision in *Mihran Demirjian, supra,* is distinguishable since in that case the office building was held by the taxpayers as partners and in the instant

---

[9] The record does not disclose any apparent reason for the difference in the name of the entity from that appearing on the partnership returns.

case tract 2347 was held by the taxpayers as their separate property. However, as noted in *Demirjian* there are several elements to be measured in this determination and we believe that upon consideration of the evidence in this case the entity created by the taxpayers can be properly classified as a partnership.

Having made the above determination we can now move on to consider the oft-litigated issue of whether the real property owned by the partnership was held "primarily for sale to customers in the ordinary course of [its] trade or business" within the meaning of section 1221(1) or section 1231(b)(1) [10] with the result that gain upon its sale is to be treated as ordinary income rather than capital gain. This issue is purely factual, its resolution depending on the unique combination of its particular facts.

To help place this issue in perspective several factors have been established as particularly relevant. Those considered most often are:

(1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales.

*United States v. Winthrop*, 417 F. 2d 905, 910 (5th Cir. 1969). However these factors have no independent significance and only form part of the entire situation presented. *United States v. Winthrop, supra* at 910.

Section 1221 defines the term "capital asset" as being property (with five statutory exceptions) held by the taxpayer. The first statutory exception, as found in section 1221(1), excludes from the definition of property: [11]

---

[10] SEC. 1231(b). DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

[11] Similar language is used in sec. 1231(b)(1), see n. 10 *supra*.

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

The purpose of this exception, as stated by the Supreme Court's opinion in *Malat v. Riddell*, 383 U.S. 569, 572 (1966), is to differentiate between gain derived from the everyday operations of a business and gain derived from assets that have appreciated in value over a substantial period of time. The Court went on to hold that, as used in section 1221(1), "primarily" means "of first importance" or "principally," *Malat v. Riddell, supra* at 572. This statutory exception had previously been clarified in *Dunlap v. Oldham Lumber Co.*, 178 F. 2d 781, 785 (5th Cir. 1950), when the court noted that the property must not only have been "held primarily for sale," but also for sale in the "ordinary course of business." See also *United States v. Winthrop, supra* at 911; *William B. Howell*, 57 T.C. 546, 555 (1972).

Petitioners argue that the property was not acquired primarily for sale citing other reasons for the acquisition of the property. Petitioner testified that the property was acquired for use in leasing and rentals, to generate additional work for the construction companies controlled by the taxpayers, and for investment purposes. However, we do not believe that the evidence in the record supports a finding that the acquisition was made primarily for either of the first two reasons.

When the property was acquired the taxpayers requested SRI to make a preliminary study of the market for office space at the property's location. Their report, which was generally pessimistic, only recommended the construction of a relatively small office building. The taxpayers then were aware at the outset that the rental or leasing prospects were not encouraging.

Petitioner did testify to several serious but ill-fated negotiations, which included the development of drawings, with prospective tenants. We can only believe that the depressed rental market, as found by SRI, contributed to these breakdowns. The taxpayers did manage to secure several leases but they do not appear to be the type that they had originally intended.

The petitioners also argue that they expected the acquisition of the property to generate additional construction work for the

companies that they controlled. However these expectations should also have been affected by the findings reported by SRI. We do not believe that this was the motivating reason for the acquisition. In fact, the taxpayers were only involved in the construction of two buildings on the property, with most of the ultimate purchasers assuming the responsibility for their own projects.

It seems clear from the record that the partnership acquired a prime tract of property in the industrial section of Oakland. We believe that this property was acquired and managed primarily for the purpose of eventual resale, hopefully at a profit. This leaves for determination whether the property was held for sale in the ordinary course of the partnership's business.

We note at the outset that the partnership has engaged in this activity for a long period of time. In 1954, it acquired property in Oakland, subdivided and improved it, and sold the individual plots by approximately 1960. Shortly thereafter the property in issue was acquired. We view the second acquisition as a replenishment of the partnership's supply of land.

With the acquisition of the property the partnership developed plans to subdivide it. The necessary documents were submitted and approved and the property was subdivided and improvements (including road construction and installation of sewerage, water, gas, and electrical facilities) were made.

We are aware that property does not lose its capital asset status merely because the taxpayer has improved his property through his own efforts. Such activity does not always produce profit derived from the everyday operation of a business. *United States v. Winthrop, supra* at 908-909. However, the record indicates that the improvements greatly increased the value of the property and this, coupled with the partnership's prior history, provides us with tangible evidence of the partnership's intentions.

The parties are in direct conflict with respect to the effect of the sales activity regarding the property. Respondent points to the magazine advertisements, the real estate brokerage listing, and the activity of the real estate brokers in the area. Most of this activity does not appear to have been generated by the taxpayers although the evidence in this regard is sparse. If the taxpayers did not encourage this activity they certainly could have put the

clamps on it. It seems clear to us that the taxpayers, the partners, held themselves out to the community as purveyors of raw land.

Petitioners point to the small number of sales, the particular reasons for some of them, and the length of time they held the property. We do note that holding an asset for several years indicates an intention to hold for investment, rather than for sale. *Austin v. Commissioner*, 263 F. 2d 460 (9th Cir. 1959). However, we believe that factors have been established that negate these elements.

This property was acquired in 1961 at a time when the area was still developing. The neighboring sports stadium complex and the rapid transit system were still in their early development stages. We believe the taxpayers were waiting for this area to develop fully before they would sell.

The problems associated with the condemnation sale, which occurred in 1968, also contributed to the holding period of the property and deterred prospective purchasers who would be unsure of the desirability of this location. Gutleben's letter to the State in 1966 complains of delays and their effect on the partnership's use of the property.

Petitioner points out that, of the five sales during the years in issue, two were attributable to condemnation or threatened condemnation action and two were connected with prior sales. As will be discussed later, we believe the former sales represent transactions made in the normal course of the petitioner's business.

Finally we note that the partnership return filed in 1962 reported the real estate profits for sales as ordinary income, thereby conceding the nature of their business for that year at least. We are also impressed with the large profits the partnership reaped through the years from its real estate activity.

Upon review of the evidence we have found factors to which both sides can point to support their position. Our determination is based upon an evaluation of those factors that have occurred over a period of years. See *Starke v. Commissioner*, 312 F. 2d 608 (9th Cir. 1963), revg. 35 T.C. 18 (1960). After careful consideration of the total factual pattern in this rather closely contested issue, we find as an ultimate fact that the partnership was engaged in the real estate business. Consequently, we hold that the property was primarily held for sale to customers in the ordinary course of its trade or business. In view of this finding,

the gain produced by the disputed sales is held to have resulted in the realization of ordinary income.

Petitioners argue even if we were to make the above finding, that the gain produced by the sales to the State of California in 1968 and 1970 under an actual condemnation action and the threat of condemnation, respectively, are entitled to be treated differently and should receive long-term capital gain treatment. They argue that, once the prospect of condemnation materialized, the plots involved were no longer held for sale to customers in the ordinary course of the partnership's business.

In support of their position they have cited several recent decisions. However, upon careful review, we find them to be distinguishable from the situation at hand. In *Casalina Corp.*, 60 T.C. 694, 703 (1973), affd. per curiam 511 F. 2d 1162 (4th Cir. 1975), and *Maurice F. Fabiani*, T.C. Memo. 1973-203, this Court found that the property involved was held for investment purposes making a discussion of the condemnation factor immaterial.

In *Ridgewood Land Co., Inc.*, T.C. Memo. 1972-16, *Juleo, Inc.*, T.C. Memo. 1971-68, and *Tri-S Corp.*, 48 T.C. 316 (1967), there is a finding that the respective taxpayers were in the business of developing real estate for residential or commercial purposes and that the condemnation action frustrated their original intentions. Since the original purpose for which the land was held had changed this Court held that they were entitled to report the gain realized on the condemnation sale as a long-term capital gain. This holding was affirmed in *Ridgewood Land Co. v. Commissioner*, 477 F. 2d 135 (5th Cir. 1973), affd. per curiam, and *Commissioner v. Tri-S Corp.*, 400 F. 2d 862 (10th Cir. 1968); and was reversed in *Juleo, Inc. v. Commissioner*, 483 F. 2d 47, 49 (3d Cir. 1973), cert. denied 414 U.S. 1103 (1973), where the court held that "A condemnation notice does not change land held primarily for sale to customers in the ordinary course of business into a capital asset."

In the case at hand we do not believe that the condemnation factor changed the partnership's intention in the manner found by this Court previously. From the evidence in the record we believe that the partnership was in the business ab initio of purchasing raw land, improving it, and holding it for sale in that condition to prospective customers. Various governmental authorities could use the property in that condition and as such

they represented potential customers for the partnership's property.

The record indicates that the partnership recognized the various governmental authorities as potential customers. Besides the two transactions in issue, there was a sale to the City of Oakland in 1962, and there were negotiations with respect to the construction of a post office. Furthermore, it appears that the amount paid by the State represented the amount that would have been paid by any other potential customers.

In our view, the condemnation element did not bring any unexpected customers to the partnership's door, but rather served as the means by which the sale was conducted. We see no reason then why the gain produced by the sales to its governmental customers should be treated any differently than the gain realized by sales to its other customers. Petitioners' argument must be denied.

Finally, having found that the entity created by the taxpayers constituted a partnership, we must now determine whether the election made individually by petitioners purportedly under section 1033, following their individual reinvestment of the proceeds, is sufficient to defer the gain realized on the condemnation sale.

Petitioners argue that a partnership is not a taxable entity and that Thomas McManus, in his separate capacity, is liable for income taxes. Since the tax liability is determined at his level, they contend it follows that he individually, and therefore also his spouse, is entitled to the benefits of section 1033.

This question and these arguments were presented to this Court and decided adversely to the taxpayer in *Mihran Demirjian, supra* at 1698-1701. We see no need to repeat here what we said in that case. Suffice it to say that we find our previous opinion controlling and we intend to apply it to the issue at hand.[12] Respondent's determination with respect to this issue must be upheld.

*Decisions will be entered under Rule 155.*

---

[12] Having determined the petitioners' individual election is insufficient to defer the gain realized, it is not necessary to discuss respondent's other objection as stated in his deficiency notice.