E. H. WINN, JR., AND BETTY LEE JONES WINN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4134–73. Filed December 20, 1976.

*Charles L. Brocato*, for the petitioners.
*Vallie C. Brooks*, for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioners' Federal income tax for their taxable years 1968 and 1969 in the respective amounts of $51,617.05 and $14,827.90. Concessions having been made, the following issues remain for our decision:

(1) Whether Internal Revenue Service Form 872–A, executed by petitioners extending the statute of limitations on the assessment of tax for their taxable year 1968, violates section 6501(c)(4),[1] I.R.C. 1954, and the Fifth Amendment to the Constitution of the United States;

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

(2) Whether petitioners are entitled to a charitable contribution deduction in the amount of $10,000 in the taxable year 1967 for a contribution made to a Presbyterian missionary; and,

(3) Whether barge charter income received by Wagren Barge Co. constituted passive investment income in excess of 20 percent of its gross receipts for the taxable year 1968 so as to terminate its election to be treated as a small business corporation pursuant to sections 1371 through 1378.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioners E. H. Winn, Jr., and Betty Lee Jones Winn, husband and wife, who resided in Greenville, Miss., at the time the petition was filed herein, filed joint Federal income tax returns for the taxable years 1967, 1968, and 1969 with the Internal Revenue Service Center, Chamblee, Ga. Petitioners utilized the cash method of accounting except with respect to farm income derived from the Rudy Plantation, Hollandale, Miss., which was reported on the accrual method of accounting.

Petitioners' Federal income tax return for the taxable year 1968 was filed on or before April 15, 1969. On January 29, 1972, and February 1, 1972, petitioners and respondent, respectively, executed Form 872–A, Special Consent Fixing Period of Limitations Upon Assessment of Income Tax, the terms of which are set forth below:

Pursuant to existing internal revenue laws, E. H. Winn, Jr., and Betty Lee Jones Winn, taxpayers of 336 Fairview Avenue, Greenville, Mississippi 38701 and the District Director of Internal Revenue (or Assistant Regional Commissioner-Appellate) consent and agree as follows:

That the amounts of any Federal income tax due under any returns made by or on behalf of the above-named taxpayers for the tax years ended December 31, 1967 and December 31, 1968 under existing or prior revenue acts, may be assessed at any time on or before the 90th day after (1) mailing by the Internal Revenue Service of written notification to the taxpayers of termination of Appellate Division consideration, or (2) receipt by the Regional Appellate Division branch office considering the case of written notification from the taxpayers of election to terminate this agreement, except that if in either event a statutory notice of deficiency in tax for any such years is sent to the taxpayers, the running of the time for making any assessment shall be suspended for the period during which the making of an

assessment is prohibited and for 60 days thereafter. If such statutory notice is sent to the taxpayers and neither of the conditions enumerated (1) and (2) in the preceding sentence have occurred, the time for making such assessment will expire 60 days after the period during which the making of an assessment is prohibited. However, this agreement will not reduce the period of time otherwise provided by law for making such assessment.

On March 5, 1973, the date the notice of deficiency was mailed to petitioners by certified mail, respondent had not mailed written notification to petitioners of termination of Appellate Division consideration nor had the Regional Appellate Division branch office considering the case received notification from petitioners of their election to terminate the agreement pursuant to Form 872–A.

Wagren Barge Co. (Wagren) is a Mississippi corporation organized under the laws of that State on September 19, 1957. In January 1966, E. H. Winn, Jr. (petitioner), and Mr. Russell Flowers transferred the assets of a partnership, also known as Wagren Barge Co., in which petitioner owned two-thirds interest and Mr. Flowers owned one-third interest, to Wagren. At the time of that transfer, petitioner owned 466⅔ shares and Mr. Flowers owned 233⅓ shares of the 700 shares of Wagren common stock then outstanding, for which they had paid $666.67 and $333.33, respectively. Wagren elected to be treated as a small business corporation pursuant to sections 1371 through 1378 of the Internal Revenue Code effective with its taxable year 1966.

In addition, petitioner and Mr. Flowers owned a two-thirds and one-third interest, respectively, in each of the following corporations: Security Barge Lines, Inc. (Security), Security Towing Co., W.F.K. Towing Co., Wagren Steel Co., and Greenville Marine Service, Inc. Throughout the taxable years involved herein, petitioner served as president of each corporation, Mr. William M. Moody was vice president, and Mr. Flowers was secretary-treasurer of each; all three men constituted the board of directors for each corporation. The operations and activities of each corporation were supervised and directed by petitioner and Mr. Flowers, who also served as the general manager of each corporation. All of the related corporations operated from the same office located in Greenville, Miss.

Prior to 1968, Security, Wagren, and the other affiliated corporations were engaged primarily in the transportation of

grain to the Gulf of Mexico and the attendant related services. However, sensing a market potential, an increased effort was made to develop a business of shipping cargo north from the Gulf of Mexico in that year.

The operations of all of the related corporations were controlled and supervised by Security and its employees from the Greenville office under the general direction of petitioner and Mr. Flowers. Records were compiled showing the combined tonnage transported by Wagren and Security and, on Security's application for a Certificate of Public Conveyance and Necessity to enable it to participate in river transportation of nonbulk cargo, the related corporations were described as a combined water transportation system. Thus, Security would actively solicit business; when successful, barges and other equipment of the related corporations would be utilized as necessary with the related income and expense assigned to the corporations supplying the equipment or performing the required services. For example, if a Wagren barge were utilized, a Wagren bill of lading was issued and income and expenses attributable to the job were assigned to Wagren. Security would typically include a provision in its bid quotations to potential customers that Wagren could be substituted for Security and, as regards the movement of cargo, both companies should be treated as one.

During the taxable years 1968 and 1969, Wagren owned 49 barges. Twenty barges, which were put into service in 1968, were from time-to-time leased to Security under oral charter parties.

When a shipowner rents his vessel, the contract for the lease of the vessel is referred to as a "charter party." In a "fully found" charter, the owner delivers the equipment fully manned, supplied and equipped, and able to perform a particular job for the charterer; necessary directions and instructions are supplied by the charterer.

A "contract of affreightment" is an agreement between a carrier, which could be the owner of a vessel or a lessee charterer, and a customer whereby the carrier will undertake certain obligations which include the furnishing of the barge and the attendant affreightment services; e.g., the movement of a barge to a desired port for loading, arranging for tow and tug services, barge cleaning, and the like. A contract of

affreightment will remain in effect for a specified period and will provide for freight rates, demurrage, and for the apportionment of liability between the parties. Both Security and Wagren had in effect for the years herein under consideration affreightment contracts for hauling grain and other dry-bulk commodities.

A "bareboat" or "demise charter" is an arrangement by which complete control and possession of a vessel is turned over to a charterer. As applied to the barge business, the owner is obligated to supply the barge in seaworthy condition, free of any encumbrances which could operate to interfere with the charterer's desired use thereof. Therefore, when a charterer charters a barge on the bareboat basis, he will receive from the barge owner merely the right to utilize a particular barge. Affreightment services are not provided by the owner under this kind of agreement. Therefore, affreightment income is received by a carrier for the performance of services related to the transportation of cargo; "charter hire" or "barge charter income" is received for the bare barge itself.

The income received by the barge owner is barge charter income. To the charterer, this amount would represent barge charter expense. Wagren did not reflect any barge charter expense on its Federal income tax return for its taxable year 1968. Should the charterer furnish the chartered barge to another party, he would then earn affreightment income for the movement of the cargo and any services rendered.

In 1968, barge charter income would be received by Wagren or Security depending upon which company owned the chartered barge. Barges used to transport dry cargo on the inland waterways are "dumb" barges which have no crew or handling equipment; therefore, necessary equipment used to perform the attendant affreightment services is shore-based. Consequently, barge chartering is done on a bareboat basis.

Barge charter income received by Wagren for its taxable years 1968 and 1969 was derived from bareboat charter parties (contracts of rental) with its sister corporation, Security, largely through intercompany accounts and with unrelated parties.

For its taxable year 1968, Wagren recorded gross revenues on its books as follows:

|  | Taxable year 1968 |
|---|---|
| Freight income (grain) | $777,375.77 |
| Other cargoes (freight income) | 27,333.30 |
| Demurrage income | 40,650.00 |
| Barge charter income | 218,053.00 |
| Cash discounts—net freight | 272.32 |
| Total gross revenues | [1]1,063,684.19 |

[1] No explanation is given by the parties for the 20 cents difference between the actual total of $1,063,684.39 and the stipulated total of $1,063,684.19.

Wagren reflected the following costs of operations and other deductions on its Federal income tax return for the taxable year 1968:

| Operations | |
|---|---|
| Towing | $400,364.74 |
| Fleeting | 33,975.93 |
| Switching | 46,212.48 |
| Barge repairs | 3,330.76 |
| Depreciation | 324,669.25 |
| Insurance | 56,210.57 |
| Cleaning barges | 2,842.89 |
| Other barge expense | 1,786.27 |
| Total | 869,392.89 |
| Other deductions | |
| Insurance | $544.44 |
| Accounting | 650.00 |
| Office expense | 2,622.34 |
| Legal | 1,061.50 |
| Telephone | 525.18 |
| Miscellaneous | 729.33 |
| Total | 6,132.79 |

For its taxable year 1968, Wagren allocated the costs of its section 38 property to its shareholders as follows:

|  | Useful life 8 years or more | |
|---|---|---|
|  | New | Used |
| E. H. Winn, Jr. (petitioner) | $1,186,666.67 | $9,333.33 |
| Russell Flowers | 593,333.33 | 4,666.67 |
| Total | 1,780,000.00 | 14,000.00 |

Tons of freight unloaded by Wagren for each of its taxable years 1968 and 1969 were 316,216.12 and 381,823.64, respectively.

Towing expense represents the cost of the physical movement of Wagren's barges from their port of origin to their port of destination or to an intermediate port area and from that intermediate port to the destination port area. Such amounts were paid to W.F.K. Towing Co., Security Towing Co., or any other of a number of towing companies utilized for such purpose. The arrangements for the performance of this service were made by the employees of Security.

Fleeting expense represents the cost of a service rendered by an independent contractor in mooring or holding a barge in a safe tow point; the fleeter assumes responsibility as bailee for the barge and its contents until a line boat or harbor boat takes the barge and moves it to the shipper or consignee's dock or wharf for unloading. This service was arranged for Wagren by employees of Security.

Switching expense represents the cost of switching, which is essentially towing a barge within a port area as opposed to towing between different ports. This service was also arranged for Wagren by employees of Security.

The repairs were a cost of operation of Wagren during the years 1968 and 1969. They represent costs for the normal wear and tear on the barges as they were damaged by mechanical unloaders and handling devices that would sometimes rub holes or otherwise damage the covers of the barges or boat latches. Repair of the barges was arranged for by Security employees.

The cleaning of barges represents the cost of sweeping out the barge or shoveling out the residue of cargo which had to be removed before the next shipment. Such service would be provided by an independent contractor in most instances, but in a few instances it may have been provided by Wagren. The cleaning of barges was arranged for by the dispatchers of Security.

Surveying represents the cost for an independent surveyor to determine possible damage to the barge for the purpose of presenting a claim for such damages. The expense listed as other barge expenses in 1968 could be a surveying expense. The services of a surveyor with respect to damages to a Wagren barge were arranged for by the dispatchers of Security.

The insurance expense listed as a cost of operations by Wagren for 1968 is the cost of insurance coverage for barges owned by Wagren under four different insurance policies. Such policies covered all boats and barges of Wagren and Security and the other affiliated companies. The insurance carried on a barge owned by Wagren would cover (a) the barge hull, (b) the cargo carried by the barge, (c) liability insurance for damages to a third party, and (d) tower's collision insurance which covered an accident where two or more tows or barges are involved. Each of the four policies listed the companies covered and the barges or boats on which the coverage was to be effective. The cost of the insurance was allocated among the companies based on the ownership of the equipment covered, regardless of who was using the equipment.

A "cross-charter arrangement" is a working agreement between two barge companies whereby each company will supply needed equipment to the other company; e.g., a company needing a barge in a particular area, at a particular time, and the other company having such a barge available which can be utilized for the required haul. Wagren maintained cross-charter arrangements with Security and the Nilo Barge Lines of St. Louis, Mo.; a charter party would be executed with respect to each cross-charter with an unaffiliated company by Wagren.

Wagren Barge Co.'s investment in section 38 property in 1968 totaled $1,780,000 in new property and $14,000 of used property, all with a useful life of 8 years or more. The investment credit allocable to petitioners from Wagren in 1968 was $83,724.19.

On their 1967 Federal income tax return, petitioners claimed as a deduction a contribution made to the "Sara Barry Fund." Payment was made by check dated December 30, 1967, in the amount of $10,000. On the face of the check it was noted that the contribution was made for the Korean Presbyterian Mission. The check was endorsed "For Deposit Sara Barry Fund" and deposited in the personal account of Ms. Sara Barry at the Bank of Benoit, Benoit, Miss.

Ms. Sara Barry is petitioner's first cousin; she is the daughter of the brother of petitioner's mother. At the time the $10,000 gift was made, Ms. Barry was serving in the Korean

mission field of the Presbyterian Church in the United States. She was sponsored in her mission work in South Korea by the Benoit Presbyterian Church, the First Presbyterian Church of Greenville, Miss., and by a Presbyterian church in Chattanooga, Tenn. Petitioner regarded Ms. Barry as an agent of the Presbyterian Church at the time the gift was made.

Ms. Barry established and worked primarily with a fellowship Bible study aimed at young college students in Korea. This work, authorized by the Presbyterian Church, was in need of funds, thus the Benoit Presbyterian Church would, at various times, sponsor a Sara Barry Day to initiate contributions from members of the community. Contributions to the Sara Barry Fund in Benoit, Miss., were handled by petitioner's uncle, Ms. Barry's father, who is an elder in the Benoit church. Funds channeled to Ms. Barry's father were deposited in her personal bank account in Benoit, Miss. Although on occasion petitioner made contributions to his local Presbyterian Church in Greenville, Miss., at the time of his gift to the Sara Barry Fund he was advised that contributions to the Greenville church could be expended for the World Council of Churches, a use which petitioner did not support. Thus, petitioner made his contribution to the fund because he felt the money would be put to purposeful evangelistic ends in Korea under the agency of the Presbyterian Church in the United States.

The Commissioner, in his statutory notice of deficiency, determined that Wagren's election under section 1372(a) to be treated as a small business corporation was terminated in 1968 because it had passive investment income in excess of 20 percent of its gross receipts. He further determined that petitioner's 1967 contribution of $10,000 to the Sara Barry Fund had not been established to be a charitable contribution within the purview of section 170 and, therefore, that it was not properly allowable.

OPINION

## Issue 1. Internal Revenue Service Form 872–A

Petitioners timely filed their Federal income tax return for the taxable year 1968 and, therefore, the 3-year period for assessment and collection of the tax imposed for that year would have expired on April 15, 1972. However, before the

expiration of the period for the assessment of tax, petitioners and respondent executed Form 872–A which, pursuant to section 6501(c)(4),[2] purports to extend the assessment period until 90 days after written notification by either party of their intention to terminate the agreement. On March 5, 1973, the Commissioner mailed his statutory notice of deficiency; at that time, neither petitioner nor respondent had given notice of his election to terminate the agreement.

Petitioners herein, characterizing Form 872–A as a virtual open-ended extension of the assessment period, maintain that it is not consonant with section 6501(c)(4) and, moreover, that its use constitutes a denial of the equal protection of the laws so as to amount to a denial of due process which is prohibited by the Fifth Amendment to the Constitution of the United States.

Petitioners, in essence, argue that section 6501(c)(4) contemplates an extension of the period of assessment only for a fixed period of time. However, we have recently considered that contention in *Thomas K. McManus*, 65 T.C. 197 (1975), and we adhere to the view we expressed therein:

> Upon examination of the statute we see no requirement that the statute of limitations can only be extended for a definite period of time. The statute, in fact, does allow for additional extensions of the statute of limitations beyond the period of the original agreement. As noted previously Form 872–A does permit the taxpayer to terminate the agreement upon proper notification to the respondent. [Fn. ref. omitted. 65 T.C. at 207.]

Moreover, here as there, we find no evidence to indicate that petitioners have encountered unreasonable delay or suffered undue hardship by reason of the execution of the Form 872–A.

Nor do we find a denial of due process resulting from the way in which the Commissioner has sought to apply the provisions of section 6501(c)(4) to taxpayers seeking appellate review of their case within the Internal Revenue Service. Although the execution of Form 872–A is not required, it is

---

[2] SEC. 6501(c)(4). EXTENSION BY AGREEMENT.—Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary or his delegate and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

requested by the Government to expedite the processing and resolution of difficult questions of law and fact,[3] quite laudable objectives. Due process does not demand absolute equality but rather classifications must be reasonable; a rational basis for their existence must be found. See *Ferguson v. Skrupa,* 372 U.S. 726 (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483 (1955); *Autotronic Systems Inc. v. City of Coeur d'Alene,* 527 F.2d 106 (9th Cir. 1975). The Internal Revenue Service's suggested use of the Form 872–A for those seeking appellate review is in no sense unreasonable or irrational. Accordingly, we hold the use of the Form 872–A does not deny to petitioners the equal protection of the law.

## *Issue 2. Charitable Contribution*

Respondent, viewing petitioner's gift to the Sara Barry Fund as having been made to a particular individual for use outside the United States, contends that it does not qualify as a charitable contribution within the purview of section 170(c).[4]

Petitioner counters with the assertion that the gift was made "to or for the use of" the Presbyterian Church in the United States, within the meaning of section 170 because Ms.

---

[3] See Rev. Proc. 71–11, 1971–1 C.B. 679.

[4] SEC. 170(c). CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—
* * *

(2) A corporation, trust, or community chest, fund, or foundation—

(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions exclusively for purposes specified in subparagraph (B).

Barry is a missionary and agent of that church; therefore, argues petitioner, it is deductible.

It is clear from the legislative history surrounding section 170 that amounts contributed by individuals to qualified domestic organizations are deductible even though expended outside the United States. The report of the House Ways and Means Committee relating to section 23(a), H. Rept. No. 1860, 75th Cong., 3d Sess. (1938), 1939–1 C.B. (Part 2) 728, 742, states: "If the recipient, however, is a domestic organization the fact that some portion of its funds is used in other countries for charitable and other purposes (such as missionary and educational purposes) will not affect the deductibility of the gift." Therefore, although petitioner's contribution to the Sara Barry Fund was used in Korea, it will be deductible if made "to or for the use of" a domestic organization.

We agree with respondent that petitioner may have been motivated to make his contribution to the Sara Barry Fund instead of his local church because he feared that a contribution directly to that body would inure to the benefit of the World Council of Churches; however, that fact will not vitiate the deductibility of the gift if otherwise qualified.

Respondent, in support of his contention, argues that petitioner made his gift to Sara Barry individually and that it was specifically earmarked for her use outside the United States. He further contends that it was petitioner's intent to thereby deprive the Presbyterian Church of any control or influence over the funds. So viewing the facts, respondent maintains that the gift is not deductible; he cites *Muzaffer ErSelcuk*, 30 T.C. 962 (1958), and *S. E. Thomason*, 2 T.C. 441 (1943), in support of this contention.

The only evidence offered by petitioner was the testimony of Dr. Winn who testified that his uncle "handled" the funds and the parties stipulated that petitioner's check for $10,000 payable to the "Sara Barry Fund" was deposited to Sara Barry's personal bank account. The evidence is inadequate to show any control by the Presbyterian Church in the United States. The only inference that can be drawn from the record before us is that Dr. Winn's uncle acted as a conduit to channel contributions from the church in Benoit to Sara Barry's personal bank account. Such an inference does not demonstrate adequate control by the Presbyterian Church in

the United States to allow the deduction. Cf. *George E. Peace*, 43 T.C. 1 (1964). There is no evidence that the funds were ever under the general control of the charitable organization, the Presbyterian Church in the United States. Although we have no doubts that Dr. Winn intended the funds contributed to be used by Sara Barry in missionary work, we cannot allow the deduction because there is not adequate proof that the contribution was "to or for the use of" the Presbyterian Church in the United States as required by section 170.

## Issue 3. Termination of Section 1372 Election

Although the parties agree that Wagren received "barge charter income," derived from bareboat charter arrangements, in excess of 20 percent of its gross receipts for the taxable years 1968 and 1969, they differ as to the proper characterization of that income for purposes of section 1372. Respondent, viewing such amount as "passive investment income" derived from rental within the meaning of section 1372(e)(5)(C), concluded that Wagren's election to be treated as a small business corporation was terminated effective for its taxable year 1968. However, petitioners advance several theories in support of their contention that Wagren's barge charter income was not "rent" within the purview of section 1372, but was, instead, operating income derived from Wagren's participation in an inland water transportation system with its sister corporation. Should we find that the receipts did constitute passive investment income in sufficient amounts to terminate Wagren's election under section 1372, petitioners would be unable to utilize on their joint income tax returns their allocable share of Wagren's investment tax credit for the taxable year 1968 and succeeding years.

The provisions of subchapter S were intended by Congress to be made available to small corporations "actively engaged in trades or businesses;"[5] a corporation producing substantial amounts of "passive investment income" is not entitled to be treated as a small business corporation. Thus, section 1372(e)(5)[6] provides that an election under subchapter S will

---

[5] H. Rept. No. 1238, 89th Cong., 2d Sess. (1966); S. Rept. No. 1007, 89th Cong., 2d Sess. (1966), 1966–1 C.B. 527,532.

[6] SEC. 1372(e)(5). PASSIVE INVESTMENT INCOME.—

(A) Except as provided in subparagraph (B), an election under subsection (a)

terminate if the electing corporation has "passive investment income" in excess of 20 percent of its gross receipts. Moreover, the statute specifically defines rent as one variety of "passive investment income;" therefore, we must apply that definitional language to the facts presented herein. See, e.g., *Western Union v. Lenroot,* 323 U.S. 490, 502 (1945).

It is clear that bareboat charter income is rent in the sense that it represents an amount received for the use or right to use property; herein, the barges. We cannot agree with petitioners' contention that the law of admiralty would mandate treatment of bareboat charter income as something other than rent. Indeed, the Supreme Court, nearly a century ago in *United States v. Shea,* 152 U.S. 178, 187–188 (1894), described the nature of such receipts to be as follows:

> These authorities, although not all touching the question of rent, bring out clearly the essential differences between the two kinds of affreightment contracts—the one in which there is a demise of the vessel, a parting with all possession and control, and the other in which the owner, retaining the possession and control, contracts simply for service * * *
>
> If the contract is one of the former kind, then rent is payable until the end of the stipulated term and the return of the vessel. * * * [152 U.S. at 187–188.]

Petitioners further assert that because an appeal in the instant case would lie in the Court of Appeals for the Fifth Circuit, we should hold in their favor upon the authority of *House v. Commissioner,* 453 F.2d 982 (5th Cir. 1972), revg. a Memorandum Opinion of this Court. That case involved corporations engaged in lending money which elected subchapter S status. Section 1372(e)(5) at that time was

---

made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation. * * *

(C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Gross receipts derived from sales or exchanges of stock or securities for purposes of this paragraph shall not include amounts received by an electing small business corporation which are treated under section 331 (relating to corporate liquidations) as payments in exchange for stock where the electing small business corporation owned more than 50 percent of each class of the stock of the liquidating corporation.

headed "Personal Holding Company Income" and it provided that if more than 20 percent of the gross receipts of the corporation consisted of interest (or other items of income not involved there), the subchapter S status would terminate. The Court of Appeals held that the heading of section 1372(e)(5) must be read in context with the body of the section and because the corporations were not personal holding companies, the interest earned could not be so considered to deny subchapter S status.[7] Although the corporations there earned interest income they were not personal holding companies because of the specific statutory exception of section 542(c)(6). That case does not deal with the meaning of the heading of section 1372(e)(5) which applies to the taxable years before us; i.e., "Passive Investment Income," except to point out that Congress by the use of that term identified the type of income as it had done in previously describing "personal holding company income."

Wagren in the instant case is not exempt from being a personal holding company and if any of the language of *House v. Commissioner, supra,* would apply here, it would be that the heading "Passive Investment Income" cannot be ignored. We agree that it should not be ignored which, in turn, compels us to examine Wagren's income to see whether more than 20 percent of its gross receipts consisted of rent within the meaning of section 1372(e)(5)(C). We conclude that the appropriate test to be applied here is governed by *Bramlette Building Corp. v. Commissioner,* 424 F.2d 751 (5th Cir. 1970), affg. 52 T.C. 200 (1969), which was neither cited nor discussed by the Fifth Circuit in *House v. Commissioner, supra.* *Bramlette* involved rents as does the instant case and the years involved were covered by the "Passive Investment Income" heading of section 1372(e)(5) instead of the "Personal Holding Company Income" heading. The Fifth Circuit applied section 1.1372–4(b)(5)(vi), Income Tax Regs.,[8] to ascertain

---

[7] The Fifth Circuit reasoned as follows: "We do not believe that proper statutory construction will permit the Commissioner to lift or isolate the word 'interest' from its context to give it a meaning that does violence to Congressional purpose. [453 F.2d at 987.]"

[8] Sec. 1.1372–4(b)(5)(vi). *Rents.* * * * Payments for the warehousing of goods or for the use of personal property do not constitute rents if significant services are rendered in connection with such payments.

whether the taxpayer provided significant services to its tenants from which it earned rental income. The taxpayer received virtually all of its income from the rental of office space. The Fifth Circuit pointed out that the services rendered were not different from those furnished by other office buildings and the Court strictly applied the language of the regulations to affirm our decision that the taxpayer was not entitled to subchapter S status. We conclude that the activities of Wagren should, therefore, be examined in light of the regulations to see whether Wagren rendered significant services in connection with the production of the barge charter income earned in 1968; the barge charter income is the item subject to scrutiny. Cf. *BJR Corp.*, 67 T.C. 111 (1976).

Pursuant to section 1.1372–4(b)(5)(vi), Income Tax Regs., amounts received for use of property will not constitute rents within the purview of section 1372(e)(5) if "significant services" are rendered. In applying this test of the regulations to ascertain the nature of the receipts, we are to examine only those services rendered "in connection with" the amounts received.

Petitioners contend that the barge charter income is not rent within the meaning of the regulations because Wagren rendered significant services in connection with such receipts. In support of this contention, petitioners point to the following services, ostensibly performed by Wagren: the establishment and maintenance of its barges in a seaworthy condition; the delivery of barges to sites where needed; the maintenance of cross-charter arrangements with affiliated and nonaffiliated corporations; and insurance in some instances.

Under maritime law, in the absence of an agreement to the contrary, the barge owner is under an implied duty to furnish the vessel in a seaworthy condition, fit for the intended voyage. See, e.g., *The Southwark*, 191 U.S. 1 (1903); *Church Cooperage Co. v. Pinkney*, 170 F. 266 (2d Cir. 1909). However, the mere execution of a warranty of seaworthiness or the resultant liability from a similar duty imposed by law does not constitute in itself a service, significant or otherwise, within the purview of the regulations. To view the test of the regulations otherwise would not comport with the clear mandate of the legislative history that a subchapter S

corporation be actively engaged in business. We must, therefore, examine the activities undertaken by Wagren, in addition to its warranty of seaworthiness, to ascertain whether "significant services" were rendered to produce the "barge charter income."

Petitioners, relying on several revenue rulings,[9] point to the cleaning and general repair of the barges undertaken by Wagren as examples of significant services performed. We are unable to agree. The evidence produced in this regard was the amounts listed by Wagren on its tax return as having been expended for cleaning and repairs. Initially, we note the absence of any evidence to indicate what part of the total expenditure for cleaning and barge repair was attributable to the income derived from the bareboat charter receipts; and what part applied to freight income, but in any event, even assuming that all of the expenditure for 1968 was so attributable, the amount is not significant. The total cost of all operations for 1968 was $869,392.89 while the combined total for cleaning and barge repairs amounted to a mere $6,173.65. In addition, the ambiguous category styled on Wagren's 1968 return as "other barge expense," insufficiently explained at trial, adds a mere $1,786.27. As a percentage of the total "barge charter income" of $218,053 recorded in that year, the combined total is certainly not significant. Moreover, the evidence does not establish that such services were either performed or arranged for by Wagren.

As regards petitioner's contention that Wagren rendered significant services by delivering barges to sites where they were needed, the evidence simply is insufficient to establish that such a service was actually provided by Wagren, or that such a service was significant. Indeed, the evidence shows instead that Security made all such arrangements. The testimony of Mr. Hensley indicates that Wagren was little more than a passive participant in the combined water transportation operation conducted by petitioner and Mr. Flowers through Security. Income and expense were allocated by Security to the other affiliated corporations primarily

---

[9] In the following rulings, the IRS determined that amounts received were not rent for purposes of sec. 1372(e)(5): Rev. Rul. 64–232 (leasing of personal property, corporation provided delivery, pickup, washing, polishing, and repair of items prior to lease); Rev. Rul. 65–40 (short-term car leasing, corporation provided gas, oil, tire repair, leasing, polishing, oil changing, body repair); Rev. Rul. 65–91 (parking lot operation, attendant provided who parks cars in available spaces).

based upon which corporation held legal title to equipment utilized in the performance of the particular activity. Security even provided in its contractual arrangements that Wagren equipment could be substituted for that of Security at its option. From the record as a whole, it appears that all significant arrangements made in connection with the barge rentals were made by Security or at its direction.

Policy directions for the combined group of affiliated corporations were issued by petitioner and Mr. Flowers but there is no evidence to indicate when, if ever, they were acting in their capacity as officers and employees of Wagren. The income earned and expense incurred by Wagren amounted to little more than intercompany book allocations made at the direction of petitioner, Mr. Flowers, and other employees of Security.

To comply with the regulations, a corporation must actively engage in the production of rentals; it must provide or make arrangements for significant services. Herein, the services provided or arranged for by Security cannot be attributed to Wagren. Significant services within the meaning of the regulations must be rendered by the corporation seeking to qualify under subchapter S. See *Bramlette Building Corp. v. Commissioner, supra.*

Thus, also, there is no merit in petitioner's contention that the barge charter income is not rental because it arose from Wagren's participation with its sister corporations in an integrated water transportation system.

Petitioners state that Wagren provided insurance in some instances; however, they have failed to establish what part, if any, of the insurance expense for 1968 was properly allocable to the income earned from the bareboat barge charter party agreements. Moreover, on a bareboat charter in general, the cost of insurance is borne by the charterer; such was the case herein according to the terms of "Barge Charter Party" agreements submitted into evidence. Assuming, arguendo, that providing insurance constitutes a service within the purview of the regulations, petitioners have failed to establish that such a service was provided in "connection with" the barge charter income as distinguished from freight income or that if it was, it was "significant."

Finally, petitioners point to cross-charter arrangements which were maintained by Wagren with Security and other nonaffiliated corporations. We have found as a fact that Wagren did maintain such arrangements; Mr. Hensley so testified. However, this evidence is insufficient to sustain petitioner's contention. No evidence was introduced to indicate what part of the total barge charter income received was attributable to cross-charter arrangements maintained by Wagren. Moreover, Wagren did not list any barge charter expense on its Federal tax return for 1968. Therefore, it follows that no part of the barge charter income was received from cross-charter arrangements because Mr. Hensley also testified that the companies tried to reciprocate; if Nilo chartered a barge from Wagren, Wagren would have been expected to cross-charter from Nilo. Moreover, merely standing ready to provide the property, the very subject of the rental agreement, cannot be a service within the meaning of the regulations. In short, we are unable to find that Wagren performed significant services in merely maintaining cross-charter agreements.

From the record, it is clear that all of the major functions of Wagren's business—towing, fleeting, switching, cleaning and repairing equipment, and surveying—were provided for Wagren by Security. By any test of "significance," no significant services were performed by Wagren in connection with its "barge charter income." Accordingly, we hold that such receipts were "rent" within the meaning of section 1372(e)(5); therefore, more than 20 percent of Wagren's gross receipts in 1968 were passive investment income and Wagren's election was terminated for that taxable year and subsequent taxable years pursuant to section 1372(e)(5). Consequently, petitioners are not entitled to utilize Wagren's investment tax credit.

*Decision will be entered under Rule 155.*